# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 11, 2013

No. 10-30665

Lyle W. Cayce
Clerk

BOBBY SMITH,

Petitioner – Appellant

v.

BURL CAIN, WARDEN, LOUISIANA STATE PENITENTIARY,

Respondent – Appellee

Appeal from the United States District Court
for the Middle District of Louisiana

Before JOLLY, BENAVIDES, and HIGGINSON, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This federal habeas appeal arises from underlying proceedings in the state courts of Louisiana, in which Bobby Smith was convicted in a 2001 jury trial of armed robbery and conspiracy to commit armed robbery. He was sentenced by the Louisiana court to 58 years in prison without the possibility of probation, parole, or suspension of sentence. After exhausting his habeas claims in the state courts, he seeks federal habeas relief. Smith argues that the jury that convicted him was tainted by racial prejudice through the prosecution's discriminatory use of peremptory strikes in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). The district court determined that the state courts legally erred in addressing his *Batson* claim, granted him a federal evidentiary hearing on the

No. 10-30665

merits of his habeas claim, and ultimately denied relief on his substantive claim. We granted Smith a Certificate of Appealability ("COA") on the limited issue of comparative juror analysis required by *Miller-El v. Dretke*, 545 U.S. 231 (2005). After the COA was granted, the Supreme Court decided *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), which called into question whether the district court could properly grant Smith an evidentiary hearing on his *Batson* claim–a major issue in this appeal.

We hold that *Pinholster*'s restriction does not bar the federal evidentiary hearing conducted in this case because the district court first concluded, solely on the basis of the state court record, that the state courts committed legal error, as required under 28 U.S.C. § 2254(d)(1), through the state courts's "unreasonable application of, clearly established Federal law." Thus, the evidentiary hearing was committed to the district court's discretion, subject to section 2254(e)(2). Because the district court did not abuse its discretion in conducting the hearing, we will review Smith's substantive *Batson* claim in the light of the federal evidentiary record. After reviewing the record, we hold that Smith has failed to carry his burden of proving that the prosecutor's race-neutral explanations for striking the two black panelists at issue were a pretext for purposeful discrimination, and thus AFFIRM the judgment of the district court.

I.

A.

Smith's *Batson* claim is premised on the state's use of peremptory strikes on black members of the third jury panel in his armed robbery trial before the Louisiana state court. During voir dire, the prosecutor struck three black panelists in a row.[1] Although defense counsel did not raise a *Batson* objection

---

[1] Smith asserts error with respect to the peremptory strike used on Flowers, but she was not included in the COA.

2

to the prosecutor's peremptory challenges,[2] Smith himself engaged in an extended colloquy with the trial judge, who treated the discussion as a *Batson* challenge.[3] In response to Smith's remarks, the trial judge stated:

> Well, I understand what you are saying and we have made a record of your objection. And that is the best that we can do. If you're objecting that the state has attempted to exclude blacks from[,] systematically attempted to exclude blacks from the jury[,] I will accept that as a *Batson* challenge, and I will do what I am supposed to do. And what I am supposed to do is first determine whether or not I believe there has been a systematic exclusion by race or gender. I do not believe there is any showing of a systematic exclusion based upon the order in which the strikes were made, and who was left on the jury at which time. . . . Because of that I am going to deny the motion.

Neither party disputes that the trial judge incorrectly applied the *Batson* test. The trial judge also did not ask the prosecutor to explain her use of peremptory strikes or otherwise expand the record on the *Batson* issue.

The voir dire record, however, is informative with respect to the questions posed to the struck panelists and the breakdown in both sides' use of peremptory strikes. The venire initially was composed of 48 individuals, of which 37 appeared for voir dire. Of the 37 potential jurors, 27 were white and 10 were black. Each side was allocated 12 peremptory strikes. Smith used his to strike two white males, nine white females, and one black female. The state struck five white females, four black males, and three black females. The jury was empaneled with 11 white jurors and one black juror.

---

[2] When the state exercised its peremptory challenge against the three black panelists, defense counsel stated, "That doesn't surprise me," to which the prosecutor replied, "I wouldn't think."

[3] During his extended conversation with the trial judge, Smith stated: "We got one black juror on [the jury]. Out of all the juries [sic] you got you got one black juror of my peers only that you kept and you went through at least five blacks and you just discriminated all of them."

No. 10-30665

Specifically at issue in this appeal are Ethel Norman and Ben Williams, two of the three black panelists that the state struck from the third panel. With respect to Williams, the trial judge, during the initial questioning of the third panel, asked if anyone knew a member of law enforcement. Williams raised his hand signaling that he did. The judge then questioned Williams, who stated that he had been friends with, coached the son of, and served as an honorary pall bearer for a murdered Louisiana police officer. Williams, however, said that he did not associate that event with Smith's case.

At the conclusion of the trial judge's questions to the third panel, the prosecutor began questioning Norman. Norman did not self-identify as having a problem with the law, but the prosecutor stated that Norman had been sitting in the courtroom throughout voir dire and that she "happen[ed] to be sitting first." As such, the prosecutor proceeded to question Norman on the law that would be applicable to Smith's case. With respect to armed robbery, Norman stated she did not understand the law, even after the prosecutor defined it for her again. When asked about conspiracy, Norman expressly acknowledged that she did not know the legal concept. After the prosecutor provided her an example and asked if she then understood the concept, Norman replied, "Uh-huh." Lastly, the prosecutor gave Norman an example involving the law of principals and asked her if she understood the example, to which Norman stated, "No." Further conversation between Norman and the prosecutor demonstrated that Norman had an issue with convicting a defendant under the law of principals.

The prosecutor then questioned Williams, because he self-identified as having an issue with the law of principals. When asked whether he had difficulty with the law of principals, Williams stated, "Yes. I have a problem with it because it's – to me it seems like it is clustered with everybody in it. And it is just one guilty party, the one that committed the murder. Whether he acted

4

No. 10-30665

with someone or not[,] the one that did the crime should pay the penalty." After further discussion, Williams said that his disagreement was not "instilled," and that he could follow the judge's instructions. But, he also stated that he disagreed in principle with multiple murder convictions for individuals involved in the death of his friend, the police officer, since not all of the convicted individuals actually shot her. Williams also noted that he understood the concepts of armed robbery and conspiracy.

B.

Following his conviction, Smith unsuccessfully pursued state habeas relief; the courts of Louisiana denied relief. Once his state remedies were exhausted, he sought a writ of habeas corpus in federal district court under 28 U.S.C. § 2254. Smith raised seven issues as part of his federal habeas claim, including his *Batson* challenge. The magistrate judge's report, which was adopted by the district court, denied six of the claims, but recommended appointing Smith counsel for an evidentiary hearing on the *Batson* issue. At the hearing, the district court concluded that Smith had made the initial prima facie showing of racial discrimination in the voir dire. The court then heard testimony from the state prosecutor on the reasons for her use of peremptory strikes.

The prosecutor stated that she struck Norman because she did not understand or agree with the law of principals. In addition, the prosecutor noted that she takes account of many factors in her use of peremptory strikes, and that Norman further troubled her because she had been sitting in the courtroom all day during the questioning of prior panels but appeared not to have listened or understood what was previously discussed. The prosecutor also testified that the record reflected Norman's confusion over the various legal issues. With respect to Williams, the prosecutor simply noted that, "He thought that if you held a gun during the robbery you should be much more culpable than – than if you had not. So that was the reason that I had struck him."

5

No. 10-30665

Upon completion of the evidentiary hearing, the parties filed memoranda with the district court based on the now-expanded record. Smith argued that any race-neutral reasons for the peremptory challenges were negated by evidence that the two black panelists had been subjected to more extensive and in-depth questioning on their understanding of the law than any white panelists. The district court, however, concluded that Smith did not carry his burden of proving purposeful discrimination and denied his application for a writ of habeas corpus. Smith then applied to this court for a COA in order to appeal the district court's judgment. We granted the COA, but limited it to the specific question: whether the district court erred in finding that Smith had failed to carry his burden of showing that the prosecutor's race-neutral explanations for striking venire panel members Norman and Williams were a pretext for purposeful discrimination, in the light of the comparative juror analysis of *Miller-El v. Dretke*, 545 U.S. 231, 240-41 (2005).

After the COA was granted, but before oral argument was presented in the case, the Supreme Court decided *Pinholster*. Because *Pinholster* addressed evidentiary hearings in section 2254(d) cases, we ordered supplemental briefing on whether the *Pinholster* limitation applied to Smith's case.

II.

We first address *Pinholster*, and its potential application to the evidentiary hearing held by the district court. In *Pinholster*, the Supreme Court discussed whether federal district courts are permitted to hold supplementary evidentiary hearings when evaluating habeas claims under 28 U.S.C. § 2254(d)(1). Section 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

6

No. 10-30665

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Based on the statutory text, the Court held "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398. The Court found this result compelled because the "backward-looking language requires an examination of the state-court decision at the time it was made." *Id.* Cognizant of the deference traditionally given to state court decisions in habeas proceedings, the Court further concluded that, "It would be contrary to . . . allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively *de novo*." *Id.* at 1399.

Smith argues that the district court erred in conducting an evidentiary hearing because *Pinholster* limits federal habeas review to the evidence at the disposal of the state court. Under his argument, although the state court did not reach the second and third *Batson* prongs, or develop an evidentiary record on the issue, *Pinholster* limited the district court to the evidence that was in the state court record. But Smith recognizes, of course, that the state trial court did not reasonably apply *Batson* when it ruled against him at the prima facie stage of his claims; thus, in his view, he should be entitled to federal habeas relief in the form of a remand to the state trial court.

His argument, however, fails because we think that the district court did what section 2254(d)(1) allows, and what *Pinholster* does not forbid. The magistrate judge determined on the basis of the state court record that the state courts's *Batson* analysis "was contrary to, or at least involved an unreasonable

7

application of, clearly established Federal law." After making this finding, the magistrate judge recommended to the district judge that relief be granted in the form of an evidentiary hearing on Smith's *Batson* claim. The district court adopted the magistrate judge's recommendation. The *Batson* test is clearly established federal law, as determined by the Supreme Court, for the purpose of addressing claims of racial discrimination in jury selection. Smith was entitled to have the proper legal standard applied in determining whether his jury was the product of a racially discriminatory voir dire process. Because the district court appropriately and correctly concluded that the state court had unreasonably applied *Batson* under section 2254(d)(1) based solely on the state court record, *Pinholster* is inapplicable. Thus, the hearing was in error only if Smith failed to develop the basis of his claim as required under 28 U.S.C. § 2254(e)(2), or if the district judge otherwise abused his discretion in conducting the hearing.

Section 2254(e)(2) states: "If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless . . . ." Here, it was not Smith who failed to develop the factual record; Smith made a *Batson* objection, but the state court failed to provide him the opportunity to develop the factual basis of his claim through its misapplication of the *Batson* standard. Under the circumstances, section 2254(e)(2) does not bar a federal evidentiary hearing. And, when section 2254(e)(2) does not preclude the hearing, we review the district court's decision to conduct one for an abuse of discretion. *See Clark v. Johnson*, 202 F.3d 760, 765 (5th Cir. 2000) ("[T]he district court retains discretion over the decision to grant an evidentiary hearing once a petitioner overcomes the barriers presented by § 2254(e)(2)."); *see also McDonald v. Johnson*, 139 F.3d 1056, 1059-60 (5th Cir. 1998). Based on this record, the district court did not abuse its discretion.

No. 10-30665

This analysis follows our recent holding in *Blue v. Thaler*, in which we addressed *Pinholster* in the *Atkins v. Virginia*[4] context.  665 F.3d 647 (5th Cir. 2011).  In *Blue*, the appellant challenged the district court's refusal to conduct an evidentiary hearing, requiring us to discuss the application of *Pinholster* to evidence introduced for the first time at the federal level.  *See id.* at 655-57.  We stated:

> [I]f a state court dismisses a prima facie valid *Atkins* claim without having afforded the petitioner an adequate opportunity to develop the claim, it has run afoul of the Due Process Clause, and that due process violation constitutes an unreasonable application of clearly established federal law that is sufficient to deprive the state court's decision of AEDPA deference.

*Id.* at 657.  Under those circumstances, "a district court abuses its discretion if it does not conduct an evidentiary hearing on an *Atkins* claim."  *Id.*  We thus found that *Pinholster*'s limitation on federal evidentiary hearings does not apply once the district court concluded, solely on the basis of the state court record, that the state trial court unreasonably applied federal law.  Because the state court decision is no longer entitled to deference, the federal court is free to properly address the claim and grant appropriate relief.  *See id.*; *see also Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied.  A federal court must then resolve the claim without the deference AEDPA otherwise requires." (quoting *Panetti v. Quarterman*, 551 U.S. 930, 944 (2007)) (internal quotation marks omitted)).

Consequently, the district court did not err in any respect in conducting the evidentiary hearing.

---

[4] 536 U.S. 304 (2002). *Atkins* held that the Eighth Amendment prohibits the imposition of the death penalty against any individual who is mentally retarded. *Id.* at 321.

No. 10-30665

III.

A.

We turn now to the merits of Smith's *Batson* claim. There are three steps in the *Batson* analysis. *E.g., Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009). "First, a defendant must present a prima facie case that the prosecution exercised its peremptory challenges on the basis of race." *Id.* "Second, if the defendant meets this initial burden, the burden shifts to the prosecutor to present a race-neutral explanation for striking the jurors in question." *Id.* Third, "the court must determine whether the defendant has carried his burden of proving purposeful discrimination." *Id.* "Implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id.* (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)) (internal quotation marks omitted). "The ultimate burden of persuasion lies with the defendant." *Woodward v. Epps*, 580 F.3d 318, 335 (5th Cir. 2009). We will only reverse the district court's factual findings if they are clearly erroneous. *See Wright v. Harris Cnty.*, 536 F.3d 436, 438 (5th Cir. 2008); *United States v. Terrazas-Carrasco*, 861 F.2d 93, 94 (5th Cir. 1988).

It is *Batson*'s third step that is the focus of this appeal. "When the process reaches this step, the 'defendant may rely on all relevant circumstances to raise an inference of purposeful discrimination.'" *Fields v. Thaler*, 588 F.3d 270, 274 (5th Cir. 2009) (quoting *Miller-El*, 545 U.S. at 240) (internal quotation marks omitted). We ask whether the state's proffered, race-neutral explanations are a pretext for purposeful discrimination based on a comparative analysis of prospective jurors. *See Miller-El*, 545 U.S. at 240-41. In conducting the required comparative analysis, we are guided by the Supreme Court's decision in *Miller-El*. *See* 545 U.S. at 241, 246-47, 252; *see also Reed*, 555 F.3d at 376. "If the State asserts that it struck a black juror with a particular characteristic, and it also accepted nonblack jurors with that same characteristic, this is evidence that the

10

No. 10-30665

asserted justification was a pretext for discrimination." *Reed*, 555 F.3d at 376. In addition, "if the State asserts that it was concerned about a particular characteristic but did not engage in meaningful voir dire examination on that subject, then the State's failure to question the juror on that topic is some evidence that the asserted reason was a pretext for discrimination." *Id.* Lastly, "we must consider only the State's asserted reasons for striking the black jurors and compare those reasons with its treatment of the nonblack jurors." *Id.*

B.

The district court heard the state prosecutor's testimony firsthand and concluded that the reasons offered were not a pretext for purposeful discrimination. The court reviewed the voir dire record and found that it supported the race-neutral reasons given for striking the panelists at issue: (1) Norman had an issue with the law of principals, and she had been sitting in the courtroom all day but remained confused about the legal issues discussed in-depth by prior panels; and (2) Williams self-identified his issue with the law of principals, even maintaining his disagreement in the context of the murder of his close friend. Furthermore, the district court conducted a comparative analysis of white and black jurors to ascertain any disparities in their treatment. The court determined that there had been no purposeful discrimination in the voir dire; the record showed that prior panels also had discussed and been questioned on the legal concepts at issue. Lastly, the district court noted that Smith had failed to specify panelists who were similarly situated but were not questioned or struck like Norman and Williams.

C.

Based on our own review of the record, we hold that the district court did not clearly err in its factual determinations, and that Smith has not carried his burden of proving purposeful discrimination. On appeal, Smith has asserted essentially the same arguments that he advanced before the district court. His

main argument remains that the voir dire was tainted by an undercurrent of racial bias, demonstrated by the exchange between defense counsel and the prosecutor after she struck Norman and Williams. Defense counsel stated, "That doesn't surprise me," and the prosecutor responded, "I wouldn't think." His specific argument with respect to Norman and Williams is that other jurors were not subject to the same, in-depth questioning that they were required to undergo. As to Williams, Smith states that he was close friends with a police officer, and that he was able to grasp the legal concepts as the questioning went on. With respect to Norman, Smith argues that she was the only juror subjected to a "pop quiz" on the law of armed robbery, conspiracy, and principals. He concludes that the use of peremptory strikes on both individuals was racially motivated.

But this argument fails because Smith has not pointed to any similarly situated jurors for the purpose of comparative analysis. Although the prosecutor struck three black panelists in a row from the third panel, the use of peremptory strikes over all three panels demonstrates that there is no evidence of general racial bias at work during the voir dire. From the first panel, the state exercised seven peremptory challenges, striking four white panelists and three black panelists. From the second panel, the state struck one white panelist and one black panelist. Lastly, the state struck three black panelists from the third panel. The defense, however, struck four white panelists and one black panelist from the first panel, six white panelists from the second panel, and one white panelist from the third panel. Thus, the actual use of peremptory strikes does not support a showing of the prosecutor's general racial bias.

Nor does a comparison of jury selection show that the prosecutor had one script for white panelists and another for black panelists. During voir dire, the panels initially were questioned by the trial judge about their basic personal information: name; occupation; marital status; number and ages of children;

race; and gender. The trial judge also asked questions designed to reveal possible bias: familiarity with the parties, witnesses, attorneys, or law enforcement; past arrests of panelists or family members; and past encounters with the police. The prosecutor, who questioned each panel before defense counsel, would then follow up with each panel member individually, filling in gaps and asking additional questions where needed. After her initial questioning, the prosecutor then would discuss the law of armed robbery, conspiracy, and principals, all of which were applicable in Smith's case. The prosecutor only deviated from this process with the third panel, where she combined her questioning to ask both personal and legal questions of each panelist individually. Instead of racial motivation for the truncated questioning, however, the record indicates that the voir dire of the third panel occurred late in the day–questioning began after 7:15p.m.–and that all parties were attempting to shorten the process.

Furthermore, in the jury selection process, the prosecutor routinely singled out individuals, both black and white, when they self-identified in response to her open-ended question. For example Ms. Tynes, who is white and was on the first panel, was asked additional questions when she acknowledged that she watched legal television shows. The prosecutor also singled out individuals like Mr. Rathcke, a white male, when they gave visual signs of confusion or disagreement, such as having a puzzled look on their face or furrowing their brow. Thus, the singling out of Williams over an issue was not restricted to him or to black panelists generally; it was a common characteristic of the prosecutor's voir dire technique.

To put a fine point on the questioning of Norman, however, it was different when compared specifically to other panelists who sat first on their respective panels. The prosecutor began with the same questions clarifying Norman's personal information, but she then deviated from her prior practice and asked

No. 10-30665

Norman to state the legal concepts in her own words. The district court credited the prosecutor's testimony that she struck Norman, in part, because she was confused even after the prosecutor offered further explanation. Indeed, our review of the record demonstrates that after Norman answered the question, the prosecutor restated the concepts in legal terms and asked her if she understood. Providing an explanation, and then asking whether the panelist understood, is in line with the prosecutor's approach during the earlier panels. The record also shows that other members of the third panel were asked to state applicable legal concepts in their own words. For example, Mr. Brown, a white male, was asked to restate the concept of reasonable doubt. Additionally, Norman had been present in the courtroom all day, and the prosecutor was concerned that she had failed to understand any of the legal concepts relevant to the case, despite all the preceding discussions. In short, the district court did not commit clear error in crediting the prosecutor's testimony with respect to Norman.

Finally, we should note that the COA we granted was, in fact, limited to the issue of a comparison of white and black jurors who were struck or who were not struck, and, although Smith did not point to specific jurors for comparative analysis, we have conducted an in-depth review of the record, as indicated above. It is clear to us that he has not carried his burden of proving a case of purposeful discrimination.

## IV.

In this opinion, we have concluded that the evidentiary hearing was not barred by *Pinholster* because the court determined that the state courts had violated clearly established federal law through the misapplication of *Batson*, based solely on the state court record; the district court therefore acted appropriately in granting Smith relief in the form of an evidentiary hearing to develop his claim, and then in determining in a federal forum the substantive merits of Smith's federal claim. Furthermore, in the light of the federal

14

No. 10-30665

evidentiary record, the district court did not err in holding that Smith failed to prove purposeful discrimination in the selection of the jury, as required under *Batson*'s third step.  The judgment of the district court, therefore, is

AFFIRMED.