# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
February 24, 2014

Lyle W. Cayce
Clerk

No. 12-31044

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

RONALD WAYNE WILKERSON,

Defendant – Appellant

Appeals from the United States District Court
for the Middle District of Louisiana
USDC No. 3:11-CR-124-1

Before JOLLY, HIGGINBOTHAM, and SOUTHWICK, Circuit Judges.

PER CURIAM:*

Ronald Wilkerson was convicted by a jury on twenty-one counts related to a scheme of preparing false tax returns. In this appeal, Wilkerson challenges the district court's denial of his *Batson* challenge. Specifically, Wilkerson argues that the race-neutral reasons that the Government offered for striking juror Lusenda Carney were pretextual. Because the district court did not clearly err in denying Wilkerson's *Batson* challenge, we AFFIRM Wilkerson's conviction.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-31044

## I.

Between 2004 and 2007, Wilkerson operated Wilkerson Tax Services, LLC ("WTS"). WTS prepared income tax returns and electronically submitted them to the IRS. In addition, WTS provided other income-tax related services such as allowing income-tax refund checks to be obtained electronically and providing refund-anticipation loans. WTS collected fees for these services.

During this time, WTS filed more than 600 false returns claiming more than $1.4 million in false telephone excise credits. Based on these false credits, the IRS issued refunds of $119,000. The fraud was discovered before the IRS issued the balance of the refunds.

Based on this conduct, Wilkerson was charged in a twenty-three count indictment. Two of the counts were later dropped at the Government's request.

## II.

Wilkerson's jury trial on these counts began in May 2012. During jury selection, forty-eight prospective jurors made up the venire, and thirteen of these identified themselves as African Americans. Initially, the court requested that the venire members state their name, age, gender, and race. Next, the district judge questioned each venire member about his or her employment and marital status. The district judge then proceeded to additional questioning in which he would ask the entire venire a question, ask those with affirmative responses to raise their hands, and then question those members who indicated an affirmative response.

After this questioning, the Government moved to strike two prospective jurors for cause: a twenty-seven-year-old African American female, and a forty-nine-year-old African American male. The district court granted the motion as to the forty-nine-year-old male but rejected the motion as to the female.

After these for-cause challenges, the parties proceeded to their peremptory strikes. The Government used five of its six peremptory challenges

No. 12-31044

on African Americans (the sixth was used on a Caucasian). Based on the proportion of strikes used against African Americans, Wilkerson raised a *Batson* challenge. *Batson v. Kentucky*, 476 U.S. 79 (1986). Wilkerson challenged the striking of four African American prospective jurors. The Government offered race-neutral reasons for striking the prospective jurors. The district court accepted the reasons offered by the Government and therefore denied Wilkerson's *Batson* challenge.

In this appeal, Wilkerson only challenges the district court's denial regarding one prospective juror – Lusenda Carney. Thus we will give a more detailed recitation of the facts surrounding that prospective juror. The Government provided several race-neutral reasons for striking Carney, a fifty-one-year-old African American woman. Specifically, the Government asserted that Carney was "absolutely nonresponsive" to questions in general – based on the fact that Carney did not respond to any of the court's open-ended questions. The Government argued that this non-responsiveness called into question Carney's ability to understand the complex case. Additionally, the Government stated that it was concerned about Carney's lack of real-world experiences.

Wilkerson countered that the Government's responses were a "charade," arguing that the case was not overly complex and that Carney's failure to answer the majority of questions presented was irrelevant.

After declining to respond directly to Wilkerson's arguments, the Government was given a final chance to sum up its reasons for striking Carney. The Government again pointed to Carney's lack of responsiveness, but also provided a list of further reasons: (1) Carney had no experience with law enforcement; (2) she "didn't have any experience at work" and "wasn't a supervisor"; (3) her life was apparently made up only of going to work and then going home; and (4) Carney appeared to be sleeping at times during the

3

No. 12-31044

proceedings (though the Government acknowledged that it may have been the glare from Carney's glasses that created this impression to them).

Wilkerson provided his final response to these race-neutral reasons. First, Wilkerson questioned the Government's suggestion that Carney was asleep during the proceedings. Wilkerson highlighted that the Government admitted that it did not know if Carney was asleep or if it was a glare from her glasses and argued that if the Government had actually believed that Carney was asleep, it would have been the first reason the Government provided for striking Carney. Second, Wilkerson argued that the Government had no basis for assuming that Carney's life only consisted of working and then going home as the Government had not asked any questions about Carney's life outside of work. Third, Wilkerson again argued that Carney's failure to respond to some of the questions was irrelevant.

The district court denied Wilkerson's challenge, finding that the Government's concerns regarding Carney's age (though the Government never raised any such concerns), her lack of responsiveness, and her ability to understand the issues were race-neutral, despite the fact that the district court might not have agreed with the Government's evaluation.

Wilkerson was subsequently convicted on all twenty-one counts, sentenced to a total term of ninety-two months, and ordered to pay more than $450,000 in restitution. Wilkerson then brought this appeal, challenging only the district court's denial of his *Batson* challenge with regards to Carney.

III.

A.

Wilkerson argues that the district court erred in denying his *Batson* challenge by failing to recognize that the Government's race-neutral explanations were merely pretextual. A district court's decision on the question of whether the prosecutor possessed a discriminatory intent is

4

afforded great deference and reviewed for clear error. *United States v. Williamson*, 533 F.3d 269, 274 (5th Cir. 2008). That said, appellate review of an alleged *Batson* violation "is not a hollow act." *Id.*

There are three distinct steps in analyzing a *Batson* claim. This appeal challenges only the third step. First, the defendant must make a prima facie showing that the prosecutor has exercised a peremptory strike on the basis of race. Next, the burden shifts to the prosecutor to provide a race-neutral explanation for the challenged strike. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 358–59 (1991). Determining whether a prosecutor intended to discriminate on the basis of race is "a question of historical fact." *Id.* at 367. And the court's ultimate inquiry "is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-based." *United States v. Bentley-Smith*, 2 F.3d 1368, 1375 (5th Cir. 1993).

This final determination of whether the prosecutor engaged in purposeful discrimination is based largely on the district court's evaluation of the prosecutor's demeanor and credibility. *Id.* at 1373. Other evidence which may be relevant includes the plausibility of the prosecutor's race-neutral explanation and side-by-side comparisons of the challenged juror with similarly situated jurors of a different race. Specifically, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Smith v. Cain*, 708 F.3d 628, 636 (5th Cir. 2013). If the Government asserts "that it struck a black juror with a particular characteristic, and it also accepted nonblack jurors with that same characteristic, this is evidence that the asserted justification was a pretext for discrimination." *Id.* And if the Government "asserts that it was concerned about a particular characteristic but did not engage in meaningful voir dire

No. 12-31044

examination on that subject, then the [Government's] failure to question the juror on that topic is some evidence that the asserted reason was a pretext for discrimination." *Id*.

In determining whether the Government's proffered reasons are pretextual, Wilkerson "may rely on all relevant circumstances to raise an inference of purposeful discrimination." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (internal quotation marks omitted). Finally, in making a determination about purposeful discrimination, the court "must consider only the [Government's] asserted reasons for striking the black jurors and compare those reasons with its treatment of the nonblack jurors." *Reed v. Quarterman*, 555 F.3d 364, 376 (5th Cir. 2009).

B.

We begin our analysis of Wilkerson's claim by emphasizing that the district judge found the Government's race-neutral reasons credible. That is, even though the district judge noted that he may not agree with the Government's reasons for striking Carney, he nonetheless found that the Government did in fact strike Carney for the offered race-neutral reasons. This finding of credibility is an important starting point in our analysis. *See Bentley-Smith*, 2 F.3d at 1373. We now move to Wilkerson's arguments as to why the district judge's decision was clearly erroneous.

In pressing this issue on appeal, Wilkerson relies heavily on side-by-side juror comparisons. Wilkerson points to these comparisons as evidence that white jurors who exhibited similar reticence during voir dire were allowed to serve, thereby discrediting the Government's assertion that it struck Carney for race-neutral reasons. A brief analysis of these side-by-side comparisons demonstrates that the district court did not err in denying Wilkerson's *Batson* challenge.

No. 12-31044

Wilkerson points to two white jurors who were allowed to serve on the jury: Jill Sellers and Benjamin Shoumaker. Although Wilkerson contends that these two white jurors were as nonresponsive as Carney, they are both distinguishable in relevant respects.

Taking Sellers first, it is true that she did not answer any of the open-ended questions that were asked, exactly as Carney did not. The Government, however, contends that it drew an inference distinguishing Sellers from Carney based on the information available. Specifically, Sellers worked for eleven years as a dental assistant. Compared with Carney's twenty-year career as a janitor, the Government argues that Sellers's career as a dental assistant indicated an increased likelihood that Sellers had some advanced education. This education, in the Government's view, made Sellers more likely to understand the Government's case.

As for Shoumaker, the Government distinguishes him from Carney on two grounds. First, in contrast to Carney, Shoumaker did answer one of the open-ended questions asked of the entire venire. The district judge asked whether any members of the panel recognized any other panel members. Shoumaker answered affirmatively, explaining that one of the other venire members worked at a Chase Bank branch that he used. He further explained that this other venire member helped him clear up a situation in which his credit card had been stolen. The Government points to this interaction as demonstrating that Shoumaker was attentive enough to recognize and identify another venire member that he interacted with. In contrast, Carney did not respond affirmatively when asked whether she knew any other panel members despite the fact that another member indicated that he recognized Carney. Second, the Government distinguishes Shoumaker by pointing to his comments about possessing a credit card. The Government argues that Shoumaker's possession of a credit card and his interaction with Chase Bank

7

raised a plausible inference that he would be better versed in financial dealings than Carney. This understanding of common financial dealings made Shoumaker more likely to understand the facts underlying the Government's case against Wilkerson.

The Government thus argues that, based on the information collected during voir dire, it reasonably could infer that Sellers had a higher level of education than Carney, and that Shoumaker was both more attentive and more financially aware than Carney. In addition to these distinctions the Government draws, we are reminded that the Supreme Court has cautioned appellate courts about taking up these side-by-side comparisons for the first time on appeal.

> "[A] retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in questions were not really comparable."

*Snyder v. Louisiana*, 552 U.S. 472, 483 (2008). Here, Wilkerson did not raise any of these comparisons at trial, thus robbing the Government of the opportunity to demonstrate other meaningful distinctions.

Even without this opportunity, however, the Government has, in our view, adequately demonstrated a good faith and reasonable belief that the proposed similarly situated jurors were not actually similarly situated. Each was distinguishable from Carney in a meaningful way. Combining these distinctions with the district judge's crediting of the Government's reasons at trial, we hold that the district court did not clearly err in denying Wilkerson's *Batson* claim.

No. 12-31044

IV.

Because the district court did not clearly err in denying Wilkerson's *Batson* challenge, we AFFIRM Wilkerson's conviction.

AFFIRMED.