# United States Court of Appeals
## For the First Circuit

No. 13-1394

DAGOBERTO SANCHEZ,

Petitioner, Appellant,

v.

GARY RODEN, SUPERINTENDENT,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

Before

Howard, Ripple,[*] and Thompson,
Circuit Judges.

Ruth Greenberg for appellant.
Thomas E. Bocian, Assistant Attorney General, with whom Martha
Coakley, Attorney General, was on brief, for appellee.

May 28, 2014

---

[*] Of the Seventh Circuit, sitting by designation.

THOMPSON, **Circuit Judge**.   The Fourteenth Amendment's Equal Protection Clause guarantees that no citizen will be excluded from jury service solely on account of his or her race.   This logical proposition, bordering on the obvious, was enshrined as a matter of clearly established constitutional law in Batson v. Kentucky, 476 U.S. 79 (1986).   Indeed, "[t]he Constitution forbids striking [from the jury] even a single prospective juror for a discriminatory purpose."   Snyder v. Louisiana, 552 U.S. 472, 478 (2008) (quoting United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir. 1994)).   The principles enunciated in Batson require both state and federal courts to "ensure that no citizen is disqualified from jury service because of his race."   476 U.S. at 99.   The matter before us involves just such a claim.   After careful review, we conclude that we must remand this matter to the district court for further proceedings.

## BACKGROUND

The Massachusetts Appeals Court ("MAC") set forth the underlying facts as they could have been found by the jury in Commonwealth v. Sanchez, 79 Mass. App. Ct. 189 (2011).  Rather than regurgitate them, we refer the reader to the MAC's run-down.   For our purposes, it is sufficient to note that Sanchez was charged with second degree murder and unlawful possession of a firearm after the shooting death of Jose Portillo in May 2005.   Id. at 189-

90. Sanchez contended at trial that his actions constituted lawful self-defense or lawful defense of another.  Id.

1. **Jury Impanelment in the Trial Court**

As Sanchez's appeal arises out of the Commonwealth's use of peremptory challenges at jury impanelment, we describe that proceeding in some detail.  Jury impanelment took place over the course of two days in September 2006.  The size of the jury pool is not disclosed in the record.  We do not know the age, racial, or ethnic background of each prospective juror or the proportion of males to females in the pool.  We do know, however, that three of the jurors peremptorily challenged by the Commonwealth were black men aged twenty-five or younger, while another was a male Latino in his forties.

The trial judge sat a jury of sixteen, which entitled each side to sixteen peremptory strikes pursuant to Rule 20 of the Massachusetts Rules of Criminal Procedure.  He acceded to the parties' joint request that he pose general questions to the entire panel to determine whether any prospective juror knew any of the parties or witnesses, as well as to delve into whether sitting on the jury would result in hardship to any prospective juror.  This initial questioning was followed by individual voir dire.

Individual voir dire sought to ascertain whether each individual juror would be able to judge the evidence fairly and

impartially.  The judge identified Sanchez as a "Hispanic person" and asked each juror if he or she "ha[d] any feelings about Hispanic people that might, in any way, affect [his or her] sworn duty to be a fair and impartial juror in this case?"[1]  Additional questioning was intended to ferret out whether jurors had any preexisting bias or prejudice against Sanchez and whether Sanchez's age on the date of the incident or at the time of trial, seventeen and eighteen years respectively, might prevent that juror from being fair and impartial.  The judge told prospective jurors that there may be evidence at trial about street gangs in Chelsea, Massachusetts, and asked whether they had "any feelings or opinions about street gangs that might affect [their] ability to be fair and impartial."  They were also told the case may involve the concepts of self-defense and defense of another and, finally, asked if there was any other reason why they may not be able to be "fair and

_____

[1] Defense counsel initially asked the trial judge to make this inquiry not just with regards to "Hispanic" people but also "people of color."  When the trial judge asked "What does, 'people of color,' have to do with this?" defense counsel opined, "I think that Hispanics are often considered to be people of color."  Defense counsel went on: "You know, ethnic bias or racial bias and that's why I put it in terms of 'Hispanic' or 'Person's [sic] of color' because they're often considered to be a person of color, and that a person who is -- has feelings, negative feelings, against a person of color might also have negative feelings against somebody who is Hispanic."  The trial judge did not respond to this statement and did not ask potential jurors about potential bias against "people of color" or against black people.  It is unclear to us why the trial judge would consider such an inquiry to be impermissible or inappropriate in the circumstances of this case.

impartial" to the parties.  Throughout this process, the trial judge afforded the parties an opportunity to suggest additional, individualized areas of inquiry based on the responses to these questions.

The trial judge excused numerous jurors for cause, including reasons such as knowledge of a witness or potential bias for or against a likely witness or the defendant.  Those jurors not excused for cause became subject to the parties' peremptory challenges, with the Commonwealth going first.  If neither party exercised a peremptory challenge, the juror was immediately seated.  Thus, the trial judge opted to have the parties use their challenges as the seats were filled, instead of seating sixteen qualified jurors before allowing the parties to exercise peremptory challenges.  We primarily concern ourselves here with the fates of five prospective jurors.

The first is Juror No. 201, a twenty-five-year-old black male who was born in Trinidad and employed as a computer technician.[2]  He did not reveal on his juror questionnaire a history of arrests or involvement with law enforcement or the court

---

[2] Although not appearing in the record, we presume Juror No. 201 was a United States citizen, as otherwise he would not have been qualified to serve as a juror in Massachusetts.  See Mass. Gen. Laws ch. 234A, § 4 (requiring any prospective juror to be a citizen of the United States); see also Commonwealth v. Acen, 396 Mass. 472, 481-82 (1986) (upholding constitutionality of citizenship requirement).  For this reason, we presume the other jurors peremptorily challenged were United States citizens, and that all those seated on the jury were too.

system.  The transcript of his individual voir dire indicates that he responded appropriately to the questions asked, and the trial judge did not excuse him for cause.   The Commonwealth, however, used its fifth peremptory challenge to keep him from being seated on the jury.

Next up is Juror No. 227, a twenty-four-year-old black man from Boston.  According to his questionnaire, Juror No. 227's only past experience with law enforcement was a prior arrest arising out of an unpaid traffic violation.  His responses to the individual voir dire questions were appropriate, the trial judge did not find any cause to excuse him, and neither party asked the court to make any further inquiry into his background.   The Commonwealth exercised its seventh peremptory challenge to exclude him from the jury.

Third is Juror No. 243, a twenty-one-year-old male born in Moscow, Russia, who the parties agree is white.  According to his juror questionnaire, he was a student at Boston University and worked part-time as an administrative assistant for a non-profit organization.   Juror No. 243 answered the court's questions appropriately, and he did not claim that serving on the jury would negatively impact his schooling.  When questioned about the nature of his studies, Juror No. 243 told the court he was studying international relations.  He did not take the opportunity to ask to

be excused from jury service. Neither party exercised a challenge, and he was seated.

Juror No. 246 was a forty-one-year-old man originally from Guatemala. When asked whether there was any reason that he might not be able to be fair and impartial, his response was "I hope I could be fair." Upon further questioning from the trial judge about his ability to remain impartial, Juror No. 246 stated "[j]ust that the responsibility – I mean, no, no." At sidebar, the Commonwealth asked the court to explore whether the prospective juror was "daunted at the responsibility of returning a verdict in this case," which led to further questioning and another rather uncertain response. The Commonwealth then exercised its eleventh peremptory challenge.

Finally, we reach Juror No. 261, a nineteen-year-old black college student from Boston. According to his juror questionnaire, he worked part-time at Home Depot and had no arrests or other contact with law enforcement or the court system. The transcript indicates that he answered the court's questions appropriately at individual voir dire. When asked, he told the court that he was a student at Northeastern University, but did not claim the disruption to his studies would constitute an undue hardship. The trial judge did not find any cause to excuse him. The Commonwealth, however, exercised its twelfth peremptory challenge to prevent Juror No. 261 from being seated.

At this point, defense counsel spoke up and objected to what he considered to be the Commonwealth's pattern of challenges against "African Americans[3] that have been . . . relatively young males." He argued "there's nothing about this juror that would support a non-discriminatory reason for exercising this challenge." The court then volunteered, "I think his youth and the fact that he's a full-time college student could be a problem."[4] The prosecutor, however, did not respond to the court's speculative statement or indicate that those were, in fact, the reasons for his challenge. Instead, the Commonwealth questioned whether defense counsel was "making a Batson-Soares[5] challenge or . . . just making a record of it[.]" Defense counsel confirmed he was objecting to the peremptory challenge against Juror No. 261, and argued that a prima facie showing of discrimination had been made based upon the Commonwealth's challenges to two previous young black men and Juror No. 246 (the man from Guatemala). Defense counsel then asserted

---

[3] As do the parties, we use the terms "African American" and "black" interchangeably. We do the same with the terms "Hispanic" and "Latino(a)."

[4] The Massachusetts Supreme Judicial Court frowns upon a trial court supplying a race-neutral reason for a prosecutor's challenge, as "that reason must come from the prosecutor, and not the judge." Commonwealth v. Fryar, 414 Mass. 732, 739 (1993). "Otherwise, the judge risks assuming the role of the prosecutor (or trial counsel) . . . ." Id.

[5] Soares v. Commonwealth, 327 Mass. 461 (1979), the bedrock Massachusetts case in this area.

-8-

that in light of the latest challenge to Juror No. 261, "this would be the fourth person of color" prevented from sitting on the jury.

The trial judge first attempted to resolve the objection by stating, "for purposes of this particular juror, alone, I will find that there is a pattern of challenging black young men." The judge then asked the Commonwealth to explain the basis for its peremptory challenge. The Commonwealth fought back, however, asking the trial judge if he was actually "finding a pattern of challenges by the Commonwealth with respect to young African American men[,]" and advising the court that it needed to find such a pattern existed before it could inquire as to the reasoning behind the challenges. The following colloquy took place between the trial judge and the prosecutor, Attorney Mark Lee:

> The Court: Basically, what I was trying to do, and I think -- I'm not so sure, so how's this, to shortcut that and for you to ask -- to tell me why --
>
> Mr. Lee: I don't think so, Your Honor, and I think the Supreme Judicial Court has been relatively clear on this point, and almost to the point where there needs to be almost specified language, and I would, at this point, ask the Court whether it is finding, as a matter of fact, that the Commonwealth has engaged in a pattern of discrimination.

The trial judge, after reviewing case law, indicated that the party raising the issue must make a prima facie showing of impropriety in the use of peremptory challenges by showing the prospective jurors who have been challenged are members of a discrete group. He

-9-

further stated that Sanchez was required to show "that there is a likelihood that they are being excluded from the jury sole[l]y on the basis of their group membership."

The trial judge initially appeared to agree with defense counsel's position, stating, "[y]ou have [n]umber one, okay, there's a prima faci[e] showing." When defense counsel said that no non-discriminatory reason for the challenges was apparent on the record, the trial judge responded, "[b]ut the question is whether it's likely there was a likelihood they were being excluded from the jury sole[l]y on the basis of their group membership, that's the second issue that has to be established by the challenging party." Defense counsel maintained that the Commonwealth was obligated to show a non-discriminatory reason, stating "there was nothing that came out in the course of voir[] dire examination that would establish a non-discriminatory reason for the challenge; that is, we have minorities who were challenged and nothing in the voir[] dire to indicate, on [its] face, a non-discriminatory reason for it." The prosecutor shot back, telling the court he "disagree[d] entirely with that analysis," and insisted he had no burden to give any explanation for his challenges unless and until the court found the Commonwealth had "engaged in a pattern of discriminatory use of [peremptory] challenges."

The trial judge went deeper into the issue. He took another look at the jurors and had defense counsel confirm that the

exclusion of Jurors No. 201, 227, and 246 formed the basis for the alleged pattern of discrimination. The trial judge opined that Juror No. 246, being from Guatemala, "under no circumstances could . . . be considered a man of color." The trial judge then reported there were, "already, five black people sitting on this jury, okay; so I can't see, as a class; regarding to the color would be a problem." He attempted to summarize defense counsel's position, stating "[w]hat you're basically saying is it's because they're young black men, is that correct; in other words, the emphasis on their age?" Defense counsel responded:

> I think that that's certainly part of it; I mean I think that that's what distinguishes these challenges from the other black persons who weren't challenged. But I think that even if you just look at the two black persons who were challenged, that would be two out of a total of seven which is a significant percentage, in and of itself. But the additional feature to the black persons who have been challenged, I believe, are the relatively youthful -- I guess one is 24 and one is 25.

Defense counsel continued, arguing that even if he were to "take out [Juror No. 246], the Guatemalan, [Juror No. 261] would be the third black man challenged out of a total of eight who have been questioned, so far." The prosecutor took the position that the challenged grouping was based on the young age of the prospective jurors, and that age is not "a protected class for purposes of Soares and Batson."

-11-

After hearing from counsel, the trial judge made an oral ruling "that there has not been shown a pattern of discrimination in this case, under the Soares case, at this time."  He then permitted the prosecutor to exercise his peremptory challenge against Juror No. 261.  At no time did the trial judge require the Commonwealth to justify its peremptory challenge to Juror No. 261, nor did the prosecutor ever offer any explanation for any of the challenges.

Jury selection continued, with each side exercising several additional peremptory challenges, but there were no further allegations of discrimination.  The record does not reveal the ethnic backgrounds of the additional jurors, or the background of any of the others who were excluded.  Thus, we know nothing about the overall ethnic makeup of the seated jury, apart from the fact that at least five members were black.  The seated jurors ranged from ages twenty-one through fifty-five, although the age of Juror No. 305 does not appear in the record.

After all the evidence was in and closing arguments completed, the trial judge instructed the jurors on the elements of second degree murder and the lesser included offense of manslaughter, along with self-defense and defense of another.  The jury found Sanchez guilty of second degree murder and possession of a firearm without a license.  The court sentenced Sanchez to life

in prison for the murder conviction, with a concurrent two year sentence for the gun offense.

## 2. Sanchez's Appeals

Sanchez appealed his conviction to the MAC. Although he pressed several grounds on appeal, the only issue we need concern ourselves with is the Commonwealth's use of peremptory challenges. Sanchez argued the Commonwealth used its peremptory challenges to exclude all "young men of color in the jury pool" in violation of the equal protection guarantees of both the Massachusetts Declaration of Rights and the United States Constitution. According to his brief to the MAC, by the time Sanchez objected to the exclusion of Juror No. 261, the Commonwealth had "peremptorily challenged four of the six non-white men called, and every man of color under thirty[,]" while "[t]wo young white men were seated without challenge." Citing both Massachusetts and federal case law, Sanchez took the position that the Commonwealth's challenges to "all young men of color" violated equal protection principles because the record established that, had they been white or female, they would have been permitted to serve. Sanchez asserted that the challenged jurors were not excluded because of their age, but because of their race.

For its part, the Commonwealth reiterated its argument that Sanchez had failed to make out a prima facie case of

-13-

discrimination. Conceding it would be improper to exercise peremptory challenges on the basis of race or gender, the Commonwealth maintained that "[a]ge, however, is not a discrete group that is afforded such constitutional protection." The heart of the Commonwealth's position was, essentially, that since at the time of Sanchez's objection there were already five black people seated and only one juror was under the age of thirty, the record showed the Commonwealth challenged the three young black men--aged nineteen, twenty-four, and twenty-five--because of their youth, not their race. Thus, the Commonwealth believed the trial judge did not err when he declined to make a prima facie finding of discrimination.

The MAC sided with the Commonwealth, focusing its analysis on the Massachusetts Declaration of Rights rather than the United States Constitution in the belief that the outcome would be the same regardless of whether it rested its decision on state or federal law. Sanchez, 79 Mass. App. Ct. at 191 n.8. The MAC set forth the controlling Massachusetts law: "Peremptory challenges are presumed to be proper, but that presumption may be rebutted on a showing that '(1) there is a pattern of excluding members of a discrete group and (2) it is likely that individuals are being excluded solely on the basis of their membership' in that group." Id. at 192 (quoting Commonwealth v. Maldonado, 439 Mass. 460, 463 (2003) (further citation omitted)). The MAC felt Sanchez's claim

-14-

of discriminatory use of peremptory challenges was foreclosed by the fact that five other black jurors had already been seated when the Commonwealth challenged Juror No. 261. Id. It then observed "age is not a protected class under either the Declaration of Rights . . . or the United States Constitution." Id. at 193. The MAC further found that the trial judge "did not err in rejecting [Sanchez's] assertion that 'persons of color' includes both African-American and Hispanic jurors and constitutes a discrete aggregate group under Soares." Id. As such, the MAC agreed with the trial judge that Sanchez had failed to make a prima facie showing that the Commonwealth's use of peremptory challenges was likely motivated by the race of the jurors. Id. at 192-93.

Undaunted by the MAC's rejection of his appeal, Sanchez filed an Application for Leave to Obtain Further Appellate Review with the Massachusetts Supreme Judicial Court ("SJC"). Sanchez argued the Commonwealth's elimination of "four of six non-white male jurors while seating similarly situated white male jurors" required a prima facie finding of discrimination, which the trial judge erred by failing to make. Sanchez further stated the Commonwealth "deliberately" prevented all young men of color from sitting on the jury. The SJC, however, denied the petition on June 29, 2011, without issuing a written opinion. Commonwealth v. Sanchez, 460 Mass. 1106 (2011). Sanchez's subsequent petition for

a writ of certiorari from the United States Supreme Court was denied as well. <u>Sanchez</u> v. <u>Massachusetts</u>, 132 S. Ct. 408 (2011).

There being no further avenue of direct appeal in the Massachusetts courts, Sanchez turned to the federal courts and sought a writ of habeas corpus from the United States District Court for the District of Massachusetts. The district court denied the petition, but granted a Certificate of Appealability. This appeal followed.

**DISCUSSION**

**1. The Lay of the Land**

On appeal to this Court, Sanchez argues the Commonwealth's use of peremptory challenges against young African Americans violated the equal protection principles laid down in <u>Batson</u> v. <u>Kentucky</u>, 476 U.S. 79 (1986). Because the equal protection jurisprudence of <u>Batson</u> and its progeny is at the heart of the procedural and substantive issues raised by the parties, we lay the groundwork here, at the outset, to put matters into perspective.

In <u>Batson</u>, the Supreme Court reaffirmed the longstanding proposition that the Fourteenth Amendment's Equal Protection Clause bars a prosecutor from exercising a peremptory challenge based on the race of a prospective juror. <u>Id.</u> at 86-87. The "[e]xclusion of black citizens from service as jurors constitutes a primary

example of the evil the Fourteenth Amendment was designed to cure." Id. at 85. Although the Fourteenth Amendment does not provide a defendant with a "right to a 'petit jury composed in whole or in part of persons of his own race' . . . [a] defendant does have the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." Id. at 85-86 (quoting Strauder v. West Virginia, 100 U.S. 303, 305 (1879)). The Batson Court reexamined "the evidentiary burden placed on a criminal defendant who claims that he has been denied equal protection through the State's use of peremptory challenges to exclude members of his race from the petit jury." Id. at 82.

Prior to Batson, the Supreme Court had held "[i]t was impermissible for a prosecutor to use his challenges to exclude blacks from the jury 'for reasons wholly unrelated to the outcome of the particular case on trial' or to deny blacks 'the same right and opportunity to participate in the administration of justice enjoyed by the white population.'" Id. at 91 (quoting Swain v. Alabama, 380 U.S. 202, 224 (1965)). Thus, before Batson "a black defendant could make out a prima facie case of purposeful discrimination on proof that the peremptory challenge system was 'being perverted' in that manner." Id. (quoting Swain, 380 U.S. at 224). A defendant could meet this standard by showing, for example

> that a prosecutor, "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of [African

-17-

Americans] who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no [African Americans] ever serve on petit juries."

Id. at 91-92 (quoting Swain, 380 U.S. at 223).  The defendant in Swain failed to meet that standard because "he offered no proof of the circumstances under which prosecutors were responsible for striking black jurors beyond the facts of his own case."  Id. at 92.

Perhaps unsurprisingly given the Court's reasoning in Swain, subsequent decisions from the lower courts concluded "that proof of repeated striking of blacks over a number of cases was necessary to establish a violation of the Equal Protection Clause." Id.  Requiring defendants to make such showings put them to "a crippling burden of proof" and effectively rendered peremptory challenges "largely immune from constitutional scrutiny."  Id. at 92-93.  This led the Batson Court to relax the demanding standard and declare that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial."  Id. at 96.

Under Batson as originally formulated, a defendant "first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race."  Id.

-18-

(internal citation omitted).[6]  A defendant is also "entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" Id. (quoting Avery v. Georgia, 345 U.S. 559, 562 (1953)). "Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race."  Id.  It is this "combination of factors" from which the initial prima facie inference of discrimination arises.  Id.

The Court went on to stress that a trial court is required to "consider all relevant circumstances" in determining whether a defendant has satisfied the prima facie burden.  Id.  It provided a couple of "illustrative" examples.  Id. at 97.  An inference of discrimination might be drawn when there is "a 'pattern' of strikes against black jurors."  Id. Alternatively, a "prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose."  Id.  Ultimately, it is up to the trial judge to determine whether the relevant circumstances in any

---

[6] A cognizable racial group is one that is "capable of being singled out for differential treatment."  Id. at 94 (citing Castaneda v. Partida, 430 U.S. 482, 494 (1977)).

particular case are sufficient to make out a prima facie case of discrimination.  <u>Id.</u>

Once a defendant has made out a prima facie case, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors."  <u>Id.</u>  In addition to being racially neutral, the reasoning undergirding the challenge must be "related to the particular case to be tried."  <u>Id.</u> at 98. After the prosecutor provides a neutral explanation, it falls to the trial court "to determine if the defendant has established purposeful discrimination."  <u>Id.</u>  This inquiry has come to be referred to as the three-pronged <u>Batson</u> test.

Thus, while <u>Batson</u> lowered the evidentiary hurdle with respect to discriminatory use of peremptory challenges, some significant barriers remained.  First, a defendant could not object to discriminatory use of challenges unless he himself was a member of a cognizable racial group.  And even if the defendant was a member of such a group, he could object only if the prosecutor used peremptory challenges to eliminate jurors that shared the defendant's racial background.  In other words, an African-American defendant could only object to the elimination of prospective African-American jurors.  Therefore, even post-<u>Batson</u>, a prosecutor could exercise peremptory strikes on the basis of race, so long as the prosecutor simply avoided discriminating against members of the defendant's race.

A defendant's ability to object to discriminatory use of peremptory challenges has been expanded considerably in the years since <u>Batson</u> was decided. While <u>Batson</u> focused on a defendant's Fourteenth Amendment right to a fair trial, the Court turned its attention to an individual juror's right not to be discriminated against because of his or her race in <u>Powers</u> v. <u>Ohio</u>, 499 U.S. 400 (1991). The Court made it clear that, although "[a]n individual juror does not have a right to sit on any particular petit jury, . . . he or she does possess the right not to be excluded from one on account of race." <u>Id.</u> at 409. The <u>Powers</u> Court "conclude[d] that a defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by the prosecution because of their race." <u>Id.</u> at 415. Importantly, a defendant may advance such an objection "whether or not the defendant and the excluded juror share the same races." <u>Id.</u> at 402. And, in <u>Miller-El</u> v. <u>Dretke</u>, 545 U.S. 231, 237-38 (2005) ("<u>Miller-El II</u>"), the Supreme Court referred broadly to the harm that results from "racial discrimination" in the jury selection process and that is done when the "choice of jurors is tainted with racial bias." Accordingly, today a defendant is free to object to the use of a peremptory challenge without regard to whether the defendant and the excused juror are of the same race. <u>See</u> <u>United States</u> v. <u>Mensah</u>, 737 F.3d 789, 797 (1st Cir. 2013) (black

-21-

defendant objecting to peremptory challenges against Asian-Americans), cert. denied, 134 S. Ct. 1912 (2014).

In sum, Batson has expanded and evolved to better accomplish its overriding goal of ending racial discrimination in the use of peremptory challenges.  As such, the earlier strictures have fallen by the wayside.  The proper focus of a Batson inquiry, therefore, is not whether the defendant or excluded juror is part of a cognizable group, but rather whether "a peremptory challenge was based on race."  Snyder v. Louisiana, 552 U.S. 472, 476 (2008).[7]

Having set the stage, we turn our attention to the specific issues raised in this appeal.

## 2.  Standard of Review

We are called upon to review the district court's dismissal of Sanchez's habeas petition.  It is well established that "[o]ur review of a district court's grant or denial of habeas is de novo."  Healy v. Spencer, 453 F.3d 21, 25 (1st Cir. 2006) (citing Norton v. Spencer, 351 F.3d 1, 4 (1st Cir. 2003)).  Our de novo review encompasses the district court's own "determination of

---

[7] Equal protection applies, of course, to all individuals regardless of their race.  Exercising peremptory challenges against white jurors on account of their race violates Batson just as surely as does striking black jurors because of theirs.  United States v. Walker, 490 F.3d 1282, 1292 (11th Cir. 2007), cert. denied, 552 U.S. 1257 (2008).

the appropriate standard of review of the state court proceeding."
<u>Zuluaga</u> v. <u>Spencer</u>, 585 F.3d 27, 29 (1st Cir. 2009).  Although the
district court's written decision may be "helpful for its
reasoning, [it] is entitled to no deference."  <u>Healy</u>, 453 F.3d at
25.  This essentially places us "in the shoes" of the district
court and requires us to determine whether the habeas petition
should have been granted in the first instance.

**3. Exhaustion of State Remedies**

The Commonwealth argues on appeal, for the first time we
note, that Sanchez's claims are barred because he failed to exhaust
all available remedies in the Massachusetts courts.  Placing an
undue emphasis on labeling individuals as members of one group or
another--as it does throughout this appeal--the Commonwealth urges
us to find Sanchez failed to exhaust his remedies in state court
proceedings because he variously defined the cognizable class of
individuals who had been discriminated against as males who are
either "young men of color" or "African-American."  The
Commonwealth's view is that Sanchez has not previously "allege[d]
a discriminatory pattern of excluding young, African-American men,
in particular, from the jury, which is the claim being made here on
appeal."  Accordingly, the Commonwealth concludes that while a
claim of discrimination against men of color may have been

-23-

exhausted, any claim of discriminatory use of peremptory challenges against young black men is barred for failure to exhaust remedies.

In rejoinder, Sanchez argues that the grounds pressed in state court have always included his specific claim that the Commonwealth improperly exercised its peremptory challenges to eliminate "all young black men" from the jury. Responding directly to the Commonwealth's view that a claim of discrimination against "young men of color" is different from a claim of discrimination against "young black men," Sanchez points out that "men of color" is "a politically correct term [that] necessarily includes the lesser included group of black men." Sanchez also advises that he has always claimed that the Commonwealth deprived three young black men of their Fourteenth Amendment rights and that "every court prior to this has recognized this as the issue presented." Therefore, Sanchez believes that he properly exhausted all state remedies before seeking relief by way of his habeas petition.[8]

---

[8] The Commonwealth waived its exhaustion defense by failing to raise it before the district court. "When the State answers a habeas corpus petition, it has a duty to advise the district court whether the prisoner has, in fact, exhausted all available state remedies." Granberry v. Greer, 481 U.S. 129, 134 (1987). A procedural defense, such as exhaustion, is waived if not raised in response to that petition or argued before the district court. Rosenthal v. O'Brien, 713 F.3d 676, 683 (1st Cir.), cert. denied, 134 S. Ct. 434 (2013). While the Commonwealth did set out exhaustion of remedies as an affirmative defense in its answer to the habeas petition, it explicitly admitted Sanchez exhausted state remedies. The Commonwealth then failed to even mention an exhaustion defense in its brief to the district court. Thus, the Commonwealth has waived it. See Bledsue v. Johnson, 188 F.3d 250, 254 (5th Cir. 1999) (exhaustion defense waived where state admitted

The exhaustion requirement has been codified in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(b)(1)(A).  Clements v. Maloney, 485 F.3d 158, 161-62 (1st Cir. 2007).  According to the statute, a habeas applicant must "exhaust[] the remedies available in the courts of the State" before running to federal court.  28 U.S.C. § 2254(b)(1)(A).  This obligation has its genesis in the principle "that as a matter of comity, federal courts should not consider a claim in a habeas corpus petition until after the state courts have had an opportunity to act."  Coningford v. Rhode Island, 640 F.3d 478, 482 (1st Cir. 2011) (quoting Rose v. Lundy, 455 U.S. 509, 515 (1982)).  Generally speaking, a petitioner's failure to exhaust all state remedies is "fatal to the prosecution of a federal habeas case."  Id.

A claim based on federal law is not exhausted unless a petitioner has "fairly and recognizably" presented it to the state courts.  Casella v. Clemons, 207 F.3d 18, 20 (1st Cir. 2000).  By this we mean that a petitioner must have "tendered his federal claim 'in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question.'"  Id. (quoting Adelson v. DiPaola, 131 F.3d 259, 262

all state remedies had been sufficiently exhausted). Nevertheless, we proceed to the merits because the Supreme Court has advised us to "take a fresh look" at the exhaustion issue where "the State fails, whether inadvertently or otherwise, to raise an arguably meritorious nonexhaustion defense." Granberry, 481 U.S. at 134.

(1st Cir. 1997)). Stated somewhat differently, "'the legal theory [articulated] in the state and federal courts must be the same.'" Clements, 485 F.3d at 162 (alteration in original) (quoting Gagne v. Fair, 835 F.2d 6, 7 (1st Cir. 1987)).

We have identified several ways in which a petitioner may satisfy this requirement, including "reliance on a specific provision of the Constitution, substantive and conspicuous presentation of a federal constitutional claim, on-point citation to federal constitutional precedents, identification of a particular right specifically guaranteed by the Constitution, and assertion of a state-law claim that is functionally identical to a federal constitutional claim." Coningford, 640 F.3d at 482. In addition, "citations to state court decisions which rely on federal law or articulation of a state claim that is, 'as a practical matter, [] indistinguishable from one arising under federal law' may suffice to satisfy the exhaustion requirement." Clements, 485 F.3d at 162 (alteration in original) (quoting Nadworny v. Fair, 872 F.2d 1093, 1099-1100 (1st Cir. 1989)). The exhaustion requirement is not satisfied, though, if a petitioner has "simply recite[d] the facts underlying a state claim, where those facts might support either a federal or state claim." Id.

The Commonwealth's argument that Sanchez failed to meet the exhaustion requirement relies heavily on Gray v. Brady, 592 F.3d 296 (1st Cir. 2010). According to the Commonwealth, we

-26-

recognized in Gray that it is not improper for a prosecutor to strike potential jurors simply because they are "people of color." See id. at 305 n.5 (noting that although "either African-Americans or Hispanics constitute a 'cognizable group' for Batson purposes[,] . . . that is a different question from whether 'minorities' constitute such a group.") Thus, the Commonwealth asserts in its brief that Sanchez "did not present to the MAC or to the SJC the specific claim of a discriminatory pattern of excluding young, African-American men from the jury," and has, therefore, failed to exhaust that claim. We do not agree with the premise of the Commonwealth's argument.

First, Gray is of little assistance to the Commonwealth, as the case simply did not concern exhaustion of remedies. Gray addressed a situation in which the defendant attempted to establish a prima facie case of discrimination against a prospective Latino juror based solely on the court's previous finding that the prosecutor's peremptory challenges against African Americans had been racially motivated. Id. at 302-03. Gray argued the previous strikes against African Americans demonstrated that the prosecutor was discriminating against "minorities," such that the subsequent challenge of the Latino juror should be disallowed. Id. at 305.

In rejecting Gray's Batson challenge, we determined that he failed to present any "factual support" for his claim that "minorities" represent a "cognizable group" for purposes of his

-27-

Batson challenge. Id. at 306. After reviewing relevant decisions of our sister circuits, we determined that "with no evidentiary showing whatsoever, we cannot assume that 'minorities' constitute the 'cognizable group' essential to showing that the prosecutor intentionally discriminated against such a group in his or her use of peremptory challenges in violation of Batson." Id. Thus, we concluded that Gray failed to make out a prima facie Batson case. In sum, Gray represented an application of Batson principles and is inapplicable to the question as to whether Sanchez has presented a consistent claim so as to satisfy the exhaustion requirement applicable to his habeas petition.[9]

Furthermore, although the Commonwealth expends much energy attempting to convince us that Sanchez did not exhaust his state remedies because he objected to the exclusion of one group or another of prospective jurors (e.g., men "of color" or "young,

_____

[9] We note that in Gray we stated an "essential" element of Gray's particular Batson claim is a showing that the "prosecutor intentionally discriminated against such a [cognizable] group in his or her use of peremptory challenges." Gray, 592 F.3d at 306. In reaching this conclusion, we relied upon our prior opinions in Murchu v. United States, 926 F.2d 50 (1st Cir. 1991) and United States v. Marino, 277 F.3d 11 (1st Cir. 2002), along with several cases from our sister circuits, all of which were decided prior to Snyder. Snyder v. Louisiana, 552 U.S. 472 (2008)
In the wake of Snyder, a defendant need only show that a single peremptory challenge was exercised on the basis of race in order to make out an equal protection violation, regardless of the race of the defendant or the prospective juror. See id. at 478. While a defendant may meet his burden by showing a pattern of discrimination against a "cognizable group," this is but one of several conceivable options.

black men") before different courts, Sanchez made only one <u>Batson</u> objection at trial.[10]  From that time, Sanchez argued to each state court that the Commonwealth's challenge of Juror No. 261 was improper because it was based upon his race.  To the extent the exact wording of Sanchez's arguments may have varied over time, we have long held that "a petitioner need not express his federal claims in precisely the same terms in both the state and federal courts" in order to have satisfied the exhaustion requirement. <u>Barresi</u> v. <u>Maloney</u>, 296 F.3d 48, 51-52 (1st Cir. 2002) (citing <u>Picard</u> v. <u>Connor</u>, 404 U.S. 270, 277-78 (1971)).  Accordingly, we are satisfied that Sanchez has espoused the same "legal theory" throughout.  <u>Clements</u>, 485 F.3d at 162.

The only remaining question with respect to exhaustion is whether Sanchez sufficiently alerted the Massachusetts courts to the federal nature of his claim.  While the Commonwealth has not argued that Sanchez failed to do so in the state courts, we consider it here as part of our "fresh look" at the issue.  <u>See</u> <u>Granberry</u> v. <u>Greer</u>, 481 U.S. 129, 134 (1987).

We begin with the trial level.  Immediately after the Commonwealth struck Juror No. 261, defense counsel advised the

_____

[10] Although Sanchez maintains on appeal that he is objecting to the exclusion of all three young, black men, given the jury selection process utilized in this case, Sanchez waived any objection to the Commonwealth's peremptory strikes against Jurors No. 201 and 227 by failing to object to those strikes at the time they were exercised.  Thus, we limit our inquiry to the equal protection claim he advances on behalf of Juror No. 261.

trial judge that with its latest challenge the Commonwealth "has, now, exercised [peremptory] challenges against a large number of African American[s]." He also expressed his opinion that no non-discriminatory reason explained the strike. The prosecutor asked whether Sanchez was "making a <u>Batson</u>-<u>Soares</u> challenge," referring to the leading federal and Massachusetts cases on discriminatory use of peremptory challenges. See <u>Soares</u> v. <u>Commonwealth</u>, 377 Mass. 461 (1979). Defense counsel confirmed he was in fact objecting to the peremptory strike. Later in the colloquy, the prosecutor again referenced both "<u>Soares</u> and <u>Batson</u>."

Significantly, the experienced trial judge[11] did not question what the parties meant by a "<u>Batson</u>-<u>Soares</u>" challenge, which suggests he was well aware of both cases and their holdings. Indeed, it is exceedingly common for attorneys and judges to use case names as short-hand references to their holdings and the legal concepts underpinning them. We have no reason to doubt that this is exactly what happened here and that the trial judge was cognizant of the federal aspect of Sanchez's claim. Based on the foregoing, we find that Sanchez fairly presented the trial judge with his claim that the Commonwealth's peremptory challenge of Juror No. 261 violated the equal protection principles of the Fourteenth Amendment.

---

[11] We take judicial notice that the trial judge was appointed to the Massachusetts Superior Court in 1990 and retired in 2012.

Sanchez also presented his federal claim in his state appeals. A litigant satisfies the fair presentment requirement by identifying a claim as federal in his or her brief to a state appellate court. Clements, 485 F.3d at 168 (citing Baldwin v. Reese, 541 U.S. 27, 32 (2004)). This can be accomplished by referencing an amendment to the United States Constitution, id., "or by simply labeling the claim 'federal.'" Baldwin, 541 U.S. at 32. Sanchez's briefs to the MAC and the SJC both referenced the Fourteenth Amendment in general and Batson in particular, and he discussed federal case law and his interpretation of Fourteenth Amendment requirements. His in-depth treatment of the federal claim in his briefs easily satisfies the "fair presentment" standard.

After taking a fresh look at the issue, we find Sanchez exhausted his state remedies by "fairly and recognizably" presenting his federal claim to the Massachusetts courts. Casella, 207 F.3d at 20. It follows that his habeas petition is properly before us.

## 4. Merits of Sanchez's Habeas Petition

### i. General Habeas Principles

Having cleared the decks of the preliminary issues, we turn our attention to the merits of Sanchez's habeas petition. We begin with the AEDPA's statutory framework, 28 U.S.C. § 2241 et

-31-

seq.  "[A] circuit judge . . . shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States."  28 U.S.C. § 2254(a).  A habeas petition

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "Federal habeas exists to rescue those in custody from the failure to apply federal rights, correctly or at all."  Nadworny, 872 F.2d at 1096.  The Supreme Court has repeatedly held that the habeas standard embodied in Section 2254(d) is "difficult to meet," and that the statute acts as a limitation upon the authority of federal courts that "all federal judges must obey."  White v. Woodall, 134 S. Ct. 1697, 1701-02 (2014) (internal quotation marks omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists

-32-

could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011). Such a finding is a precondition to the grant of any form of habeas relief, as "habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Id. (internal quotation marks omitted.) In sum, a petitioner bears the burden of demonstrating "that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of disagreement." Id. at 786-87.

These are not the only limitations with respect to habeas petitions. We shall address additional conditions as necessary.

### ii.   Clearly Established Federal Law

Pursuant to Section 2254(d)(1), federal courts are prohibited from granting habeas relief unless the petitioner shows that the state court's decision involved "clearly established Federal law" and was either "contrary to" or an "unreasonable application of" that law. Thaler v. Haynes, 559 U.S. 43, 47 (2010) (per curiam). Because a petitioner is required to demonstrate that his claim involves "clearly established federal law" regardless of whether the state court's decision is alleged to be "contrary to" or an "unreasonable application of" federal law, we begin our

inquiry there. In the context of this case, Sanchez must show that Batson--and the proposition that a prosecutor may not exercise peremptory challenges on the basis of race--constituted clearly established federal law at the time his conviction became final in 2011.[12]

"Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." White, 134 S. Ct. at 1702 (internal quotation marks omitted); see also Thaler, 559 U.S. at 47 ("A legal principle is 'clearly established' within the meaning of this provision only when it is embodied in a holding of this Court."). In evaluating whether a principle of federal law is "clearly established," we must look to cases decided by the Supreme Court rather than our own case law. Id. at 1702 n.2. Further, we confine our inquiry to the state of federal law "as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000).

The parties are in apparent agreement that Batson sets forth "clearly established federal law." Sanchez has not briefed that specific issue, and the Commonwealth explicitly states that it does. We agree as well.

---

[12] The MAC issued its opinion on April 1, 2011, and the SJC denied Sanchez's application for further appellate review on June 29, 2011. Our determination of the state of clearly established federal law is the same regardless of which date is utilized.

When it was decided, Batson made clear that peremptory challenges may not be exercised on the basis of race. And in recognizing that "[e]xclusion of black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure," Batson did not announce a new principle of federal law. 476 U.S. at 85. Instead, Batson harkened back to the Fourteenth Amendment in order to highlight this longstanding principle's venerable lineage. Subsequent Supreme Court case law has only reinforced Batson's holding, culminating in Snyder's adoption in 2008 of the Ninth Circuit's statement that "[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose." Snyder, 552 U.S. at 478 (quoting United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir. 1994)). It is difficult to imagine a formulation of this principle that could be any more direct or explicit. We also find it significant that Snyder resulted in the Supreme Court's on-the-merits reversal of a state court's finding that certain peremptory challenges were not motivated by racial discrimination, id. at 486, demonstrating that the Supreme Court considers Batson and its application to constitute clearly established federal law. Accordingly, we find that at the time Sanchez's conviction became final in 2011, it was clearly established as a matter of federal law that a prosecutor is prohibited from exercising challenges on the basis of race.

### iii. Unreasonable Application of Clearly Established Federal Law

We must now consider whether the MAC's decision was contrary to or represented an unreasonable application of clearly established federal law.[13]  When reviewing a state court's application of federal law, we are cognizant that "state courts must reasonably apply the rules 'squarely established' by [the Supreme] Court's holdings to the facts of each case."  White, 134 S. Ct. at 1709 (quoting Knowles v. Mirzayance, 556 U.S. 111, 122 (2009)).  "[U]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'"  Williams, 529 U.S. at 413.

However, given the level of deference required by the habeas statute, we may not grant habeas relief simply because we disagree with a state court's reasoning or feel that it reached an incorrect result.  "[A]n unreasonable application of federal law is different from an incorrect application of federal law."  Id. at 410.  For us to find that a state court unreasonably applied

_____

[13] The SJC summarily denied Sanchez's application for further appellate review.  As such, we "must 'look through to the last reasoned decision' in evaluating the basis for the state court's holding."  King v. MacEachern, 665 F.3d 247, 252 (1st Cir. 2011) (quoting Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010)) (further citations omitted).  Thus, we turn our attention to the MAC's opinion.

federal law, its application "must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." White, 134 S. Ct. at 1702, (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)).

Circling back to Batson, the Supreme Court has "made it clear that in considering a Batson objection, or in reviewing a ruling claimed to be Batson error, all of the circumstances that bear upon the issue of racial animosity must be consulted." Snyder, 552 U.S. at 478 (citing Miller-El II, 545 U.S. at 239). Here, the MAC unreasonably applied Batson's first prong in that it wholly failed to consider all of the circumstances bearing on potential racial discrimination. Instead, the MAC dismissed the racial challenge out-of-hand by its facile and misguided resort to the undisputed fact that the prosecutor had allowed some African Americans to be seated on the jury. See Sanchez, 79 Mass. App. Ct. at 192.

Notably, the MAC's written opinion rejected Sanchez's racial discrimination claim in a single sentence that merely acknowledged the presence of other black people on the jury.[14] Id. The MAC indicated any discrimination must have been based on age,

_____

[14] The MAC also agreed with the trial judge that "persons of color"--a grouping which would have included the Latino juror the Commonwealth struck--do not make up a "discrete aggregate group" for purposes of its Soares analysis. Id. at 193. Although the Latino juror also possessed the right not to be discriminated against on the basis of his race, Sanchez does not press any claims on his behalf.

-37-

not race, because the prosecutor allowed a good number of potential jurors of more mature vintage to be seated.  See id. at 193.  This, in effect, recast Sanchez's race-based challenge as an age-based objection.  The MAC gave no consideration whatsoever to Sanchez's argument that no non-discriminatory reason explained why the prosecutor struck Juror No. 261 but not other prospective jurors. Thus, the MAC disregarded the Supreme Court's exhortation that it must consider all circumstances bearing on potential discrimination.

Further, by focusing exclusively on the presence of other African Americans on the jury at the time of Sanchez's Batson challenge, the MAC ignored Juror No. 261's right not to be discriminated against on account of his race.  The MAC simply missed the core concern addressed in the Supreme Court's jurisprudence.  Even more troubling, the MAC's application of Batson sent the unmistakable message that a prosecutor can get away with discriminating against some African Americans (and by extension, individuals from any other ethnic background) on the venire:  so long as a prosecutor does not discriminate against all such individuals, not only will his strikes be permitted, but he will not even be required to explain them.  Perversely, this application may well lead to increased racial discrimination in jury selection, a result diametrically opposed to Batson's core rationale that "[a] persons's race simply 'is unrelated to his

fitness as a juror.'" Batson, 476 U.S. at 87 (quoting Thiel v. S. Pac. Co., 328 U.S. 217, 227 (1946) (Frankfurter, J., dissenting)).

All in all, there can be no doubt that the MAC failed to inquire into all of the facts and circumstances relevant to Sanchez's claim of racial discrimination. It followed up by applying Batson's first prong in such a way as to permit increased racial discrimination. The MAC's treatment of Sanchez's Batson claim was more than clearly erroneous: it was objectively unreasonable in light of clearly established federal law. See White, 134 S. Ct. at 1701. No fairminded jurist could come to any other conclusion based on the state of clearly established federal law at the time of the MAC's opinion.

Because we hold that the MAC unreasonably applied clearly established federal law, it is unnecessary for us to separately address whether the MAC's conception of Batson's three-step inquiry was "contrary to" clearly established federal law. See Thaler, 559 U.S. at 47 (recognizing that habeas may be granted where a state court's decision is either "contrary to" or represents an

"unreasonable application of" clearly established federal law).[15]

### iv. Application of __Batson__'s First Prong

That the MAC unreasonably applied the first __Batson__ prong does not necessarily entitle Sanchez to prevail on his habeas claim. See __Aspen__, 480 F.3d at 576. Sanchez must still "show that his underlying detention is unlawful and not just that the state court employed faulty reasoning in his case." __Id.__ (citing __Bronshtein__ v. __Horn__, 404 F.3d 700, 724 (3d Cir. 2005)). It is

---

[15] In reliance on state law, the MAC required Sanchez to make a showing that the prosecutor's strikes were "likely" motivated by race. __Sanchez__, 79 Mass. App. Ct. at 192. In the past, we have concluded a state court that required a defendant to show it was "likely" that a prosecutor's strike was improperly motivated "judged [the defendant's] prima facie burden by a more rigid standard than that established by __Batson__," which "clearly established that [the defendant] was only required to make a 'likelihood' showing at the final stage of the burden-shifting framework." __Aspen__ v. __Bissonnette__, 480 F.3d 571, 575 (1st Cir. 2007).

Nowhere, however, did the MAC indicate that Sanchez was required to make a "more likely than not" showing to establish is prima facie case, and the SJC has never held that a "more likely than not" showing is required to make out a prima facie case under __Soares__. Thus, it is by no means clear that the term "likely" as used in __Soares__ means "more likely than not." Moreover, the Massachusetts Declaration of Rights is intended to "provide[] at least as much protection for [a] defendant as does __Batson__." __Caldwell__ v. __Maloney__, 159 F.3d 639, 643 (1st Cir. 1998). This further weighs against our interpreting __Soares__ to require a "more likely than not" showing, as we doubt the SJC would interpret __Soares__ to require such a showing now in light of the clearly established federal law. As it turns out, given our conclusion that the MAC unreasonably applied __Batson__ to the facts of Sanchez's case, we need not determine here whether the MAC applied an improper standard or imposed upon him a heavier burden than does federal law.

conceivable that Sanchez may not be entitled to relief despite the MAC's unreasonable application of <u>Batson</u>'s first prong.  This would be the case if the facts and circumstances in the record do not give rise to an inference of discrimination when <u>Batson</u>'s first prong is properly applied.  We turn now to this inquiry, "limit[ing] our review to facts gleaned from the state court record concerning jury selection at [Sanchez's] trial."  <u>Id.</u>

Sanchez argues that the evidence in the record shows the Commonwealth challenged Juror No. 261, and the other two young black men, because of their "race/gender" combination.  Sanchez, while freely admitting that a prosecutor may exclude all young jurors, maintains that it is unconstitutional for a prosecutor to "excuse young jurors only if they are young black men, or because of membership in any other discrete group protected by the Fourteenth Amendment."  According to Sanchez, this is exactly what happened here, with the prosecutor striking young black men not because they were young, but because they were black.  Sanchez goes on to assert that he is entitled to a new trial because of this constitutional violation.

The Commonwealth concedes that the existence of a prima facie case is to be determined based on the totality of the facts and circumstances, but argues that we have "largely left the question of what constitutes a prima facie case to the wisdom of the trial judges themselves."  <u>Brewer</u> v. <u>Marshall</u>, 119 F.3d 993,

1004 (1st Cir. 1997).  It goes on to defend the MAC's decision as correct because five African Americans had been seated at the time of Sanchez's <u>Batson</u> challenge.  Their presence, at least according to the Commonwealth's brief, demonstrates that "there is no basis in the record to conclude that the prosecutor exercised his peremptory challenges on the basis of race."  The Commonwealth further argues that youth is not a suspect class for purposes of a <u>Batson</u> analysis and, for that matter, neither is the group of young African-American men.  In addition, the Commonwealth points to its strike of Juror No. 229, a young white man who was a college sophomore, as demonstrating that the prosecutor was not only striking young African-American men from the jury.

It strikes us that many of the parties' arguments are geared primarily towards step three of the <u>Batson</u> test.  Sanchez strenuously attempts to convince us that the prosecutor's strikes were racially motivated, while the Commonwealth states just as forcefully that they were not.  These types of arguments are not overly helpful here, however, because <u>Batson</u>'s third step is not at issue:  the trial judge never proceeded beyond step one.  Accordingly, we review the state court record de novo to determine whether Sanchez satisfied his burden of raising an inference of possible racial discrimination.  <u>See</u> <u>Aspen</u>, 480 F.3d at 576.[16]  If

---

[16]  We reject as inconsistent with our case law the Commonwealth's contention that Sanchez is required to overcome the MAC's finding by clear and convincing evidence given that the MAC

-42-

we find that he has, we will then address the Commonwealth's arguments that the inference is negated by other circumstances appearing in the record.

Under federal law, "[t]o establish a prima facie case, the moving party must 'raise an inference that the prosecutor used [peremptory challenges] to exclude the veniremen from the petit jury' because of their membership in a protected class."  Id. at 574 (second alteration in original) (quoting Batson, 476 U.S. at 96).  "An 'inference' is generally understood to be a 'conclusion reached by considering other facts and deducing a logical consequence from them.'"  Johnson v. California, 545 U.S. 162, 168 n.4 (2005) (quoting Black's Law Dictionary 781 (7th ed. 1999)).  Sanchez's burden at this first stage "is not substantial."  Aspen, 480 F.3d at 574.  Indeed, step one is satisfied where the circumstances permit an inference that "discrimination may have occurred."  Johnson, 545 U.S. at 173 (emphasis added).[17]

---

unreasonably applied federal law in failing to consider all of the circumstances relevant to racial discrimination.

[17] The relatively bare-bones showing required at this stage perhaps explains our past exhortation to the trial courts to seek an explanation for a prosecutor's use of peremptory challenges even where the judge may not believe such a showing has been made, as counsel's explanation facilitates appellate review and may even serve to avoid reversal should we conclude a sufficient prima facie showing had been made.  See United States v. Bergodere, 40 F.3d 512, 517 n.4 (citations omitted) ("[I]t might have been wise for the judge to have asked the prosecutor to proffer an explicit statement of the basis for the strike, if only to confirm the judge's intuition and flesh out the record on appeal.").  The record here demonstrates Sanchez and the Commonwealth were

"[A] prima facie case of discrimination can be made out by offering a wide variety of evidence." Id. at 169. Although the Supreme Court has not provided an exhaustive listing of the types of evidence that may suffice, we are guided by the examples set forth in its cases and others applying Batson. First, the defendant is "entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" Batson, 476 U.S. at 96 (quoting Avery, 345 U.S. at 562). Second, demonstrating a pattern of strikes against members of a cognizable group may raise an inference of discrimination against a particular juror. United States v. De Gross, 913 F.2d 1417, 1425 (9th Cir. 1990) (concluding the defendant's use of seven out of the allotted eight peremptory challenges against males sufficed to raise an inference of gender discrimination). In a similar vein, other factors appropriate for consideration include "the number of strikes involved in the objected-to conduct; the nature of the prosecutor's other strikes; and, as the 'capstone,' the presence of an alternative, race-neutral explanation for the strike." United States v. Girouard,

---

represented at trial by skilled and zealous counsel. While we find it difficult to fault the prosecutor for failing to volunteer information not required of him by the trial judge, having done so could have resulted in a fully fleshed-out record and, potentially, avoided the result that obtains today.

521 F.3d 110, 115-16 (1st Cir. 2008) (citing United States v. Bergodere, 40 F.3d 512, 516-17 (1st Cir. 1994)).

Also, and of great importance here, we take into account "whether similarly situated jurors from outside the allegedly targeted group were permitted to serve" on the jury in ruling on a Batson challenge. Aspen, 480 F.3d at 577 (citing Boyd v. Newland, 467 F.3d 1139, 1148-50 (9th Cir. 2006)); see also United States v. Charlton, 600 F.3d 43, 54 (1st Cir. 2010) (reviewing the record to determine if there was evidence "that similarly situated jurors (attorneys, members of clergy, or relatives of convicts) from outside the allegedly targeted group of African-Americans were permitted to serve"). Indeed, the Supreme Court puts great stock in this factor. Miller-El II, 545 U.S. at 241 ("More powerful than [the] bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve."). We give weight as well to whether there are any "apparent non-discriminatory reasons for striking potential jurors based on their voir dire answers." Aspen, 480 F.3d at 577 (citing United States v. Stephens, 421 F.3d 503, 515-16 (7th Cir. 2005)).

We turn first to the "numbers-based" considerations. The record here does not disclose the racial makeup of the jury pool or even the total number of potential jurors. What we do know based upon the parties' representations is that five African Americans

-45-

had already been seated on the jury when the Commonwealth eliminated Juror No. 261.  We also know that Juror No. 261 was the third African-American male under the age of thirty that the Commonwealth challenged.  The Commonwealth had utilized eleven of its sixteen challenges by that time and eleven jurors had already been seated.  The record does not indicate how many potential jurors remained in the pool at that point or the racial, ethnic, or gender makeup of those who remained.  Therefore, we can infer little beyond the fact that the Commonwealth struck two young black men from the jury before it reached Juror No. 261.  "Thus, as is common, the numbers considered in isolation are inconclusive," Mensah, 737 F.3d. at 802 (citations omitted), in determining whether Sanchez met his burden on step one.Christa K. Berry, Clerk, United States District Court for the District of Maine,

        We move on to consider other relevant circumstances appearing in the state court record.  We begin by looking to see whether any objective reason supporting the challenge of the third young black man, Juror No. 261, appears in this record.  We are limited to a search for objective differences because the prosecutor declined to share any of his subjective impressions of Juror No. 261 that may have explained his peremptory challenge,

such as his appearance, demeanor, or any apparent inability to follow the judge's legal instructions.[18]

Juror No. 261's answers to the juror questionnaire and the transcript of his voir dire fail to provide any obvious reason for the Commonwealth's challenge. In his questionnaire, the nineteen-year-old black man indicated that he was born in Boston, that he is a first-year college student, and that he works for Home Depot as a paint/sales associate. He did not indicate that he had been arrested or convicted of any crime, been served with a court order, or been involved in a civil suit as a plaintiff, defendant, or witness. Responding to a catchall question on the form, Juror No. 261 did not report that there was "anything else in [his] background, experience, employment, training, education, knowledge, or beliefs that might affect [his] ability to be a fair and impartial juror[.]"

When questioned at voir dire, Juror No. 261 acknowledged that he had not raised his hand in response to any of the court's preliminary questions regarding hardship. He did not tell the judge that serving on this jury would harm his studies. Juror No. 261 answered all other questions appropriately, and nothing in the written transcript casts doubt on his ability to understand and

---

[18] Had the prosecutor shared his subjective impressions or the reasons for the strike in response to the trial judge's original request, our analysis here would necessarily be different.

-47-

follow the trial judge's instructions or evaluate the evidence fairly and impartially.

We recognize that as an appellate court, our review is necessarily confined to the cold record. We are unable to make the moment-to-moment analyses and judgment calls that are so crucial to trial work. Nevertheless, we do find it significant that the record fails to disclose any obvious infirmity in Juror No. 261's background or voir dire answers that would translate to an apparent reason for the Commonwealth's peremptory challenge.

As part and parcel of our inquiry into all the facts and circumstances, we consider whether there was any evidence tending to show that similarly situated jurors who were not African-American were allowed to sit. Our comparison between Juror No. 261, a young black man, and Juror No. 243, a young white man the Commonwealth allowed to serve on the jury, is illuminating.

Like Juror No. 261, Juror No. 243 was under twenty-five years of age. In fact, and similar to Juror No. 261, Juror No. 243 was a twenty-one-year-old college student who also held down a job. Juror No. 243 did not indicate any prior contacts with law enforcement or involvement in either the criminal justice or civil law systems on his juror questionnaire. The transcript of his voir dire indicates that he also answered the court's questions appropriately, and just like Juror No. 261, he did not cite his schoolwork as grounds to be excused from service. Even when

directly asked about the nature of his studies, Juror No. 243 did not seek to be excused.

The only objective difference between the two young men appearing in this record is their race:  Juror No. 243 was white, while Juror No. 261 was African-American.  Yet, the government struck the black juror while allowing the white one to serve.  Such differential treatment, while by no means dispositive as to the ultimate question of racial discrimination, suffices at <u>Batson</u>'s first step to raise an inference of possible racial discrimination. <u>See</u> <u>United States</u> v. <u>McMath</u>, 559 F.3d 657, 664 (7th Cir. 2009) (holding a prima facie case was established where white jurors sharing the "only other known characteristic" of an African-American juror were seated but the African American was not); <u>United States</u> v. <u>Allison</u>, 908 F.2d 1531, 1538 (11th Cir. 1990) (recognizing a defendant may establish a prima facie case of discrimination where "white persons were chosen for the petit jury who seemed to have the same qualities as stricken black venirepersons") (internal quotation marks and citations omitted).[19]

---

[19] Evidence of different treatment of similarly situated jurors was conspicuously absent in other cases in which we upheld a trial judge's determination that a defendant failed to make out a prima facie case. <u>See, e.g.</u>, <u>Odunukwe</u> v. <u>Bank of America</u>, 335 Fed. App'x 58, 60-61 (1st Cir. 2009) (per curiam) (noting that plaintiff "[did] not point to any non-numeric form of evidence," including whether similarly situated jurors were allowed to serve); <u>United States</u> v. <u>Escobar-de Jesus</u>, 187 F.3d 148, 164-65 (1st Cir. 1999) (upholding finding that no prima facie case had been established where the defendant pointed to nothing more than the fact that two African Americans had been struck where "six or seven African-

Furthermore, because our review must encompass all the relevant facts and circumstances bearing on possible racial discrimination, it is appropriate to consider the characteristics of the other two young black men eliminated by the Commonwealth prior to its strike of Juror No. 261 for the bearing these strikes may have on an inference of discrimination. Juror No. 201, a twenty-five-year-old male born in Trinidad, indicated on his juror questionnaire that he worked as a computer technician and had not had any previous experience with the criminal or civil justice systems.[20] His responses to voir dire questions were generally appropriate, with only one small hiccough: the trial judge began introducing the concepts of self-defense and defense of another,

---

Americans were seated in the jury box at the time of the strikes and . . . six or seven African-Americans were eventually selected to serve on the jury"); Brewer v. Marshall, 119 F.3d 993, 1005 (1st Cir. 1997) (upholding trial judge's rejection of prima facie Batson case where "the numbers . . . particularly in the absence of circumstances suggesting juror bias, judge insensitivity, or improper motive by the state prosecutor, were not so blatant as to compel the judge to make such a finding); Chakouian v. Moran, 975 F.2d 931, 934 (1st Cir. 1992) (finding that defendant failed to establish a prima facie case where he relied on nothing more than "the objection asserted . . . at trial as a sufficient prima facie showing" and where he "point[ed] to no evidence relating to the racial composition of the venire or the empaneled jury"). The presence of such evidence here makes this case fundamentally different.

[20] Juror No. 201 did not complete the section of his juror questionnaire that asked for him to indicate the highest grade he completed in school. Two of the seated jurors did not provide that information either.

then stopped himself in mid-sentence and began again.[21]  This resulted in a brief exchange between the juror and the trial judge about those two defenses, at the conclusion of which the judge began his explanation again and Juror No. 201 did not express any further confusion.  The trial judge obviously found him fit for jury service, as he did not excuse the prospective juror for cause. Neither the Commonwealth nor Sanchez asked the trial judge to pose any further questions, and the Commonwealth then exercised a peremptory challenge.

The remaining young African-American male was Juror No. 227, a twenty-four-year-old native of Boston.  His juror questionnaire indicates he obtained a high school equivalency[22] and was employed by City Year.  He stated his only prior involvement with the criminal justice system was an arrest that resulted from

_____

[21] The record reveals these affirmative defenses gave the parties and the court fits at various points throughout trial, including the jury instruction phase.  See Sanchez, 79 Mass. App. Ct. at 195 n.13 (noting the jury "received multiple versions of the instructions over two days").  On this record, we would be speculating if we concluded that the prosecutor struck Juror No. 201 because of any initial confusion at voir dire.

[22] The prosecutor allowed at least four jurors with high school (or less) educations to be seated.  Four jurors listed their highest level of education as "high school diploma," "Highschool 12 yrs," "Diploma," and "9 Grade."  Thus, we can not infer from this record that the prosecutor considered education to be a determinative factor in whether or not he exercised a peremptory challenge, or that he challenged Juror No. 227 due to his limited educational achievement.

a "[t]raffic violation that went unpaid."[23]  Juror No. 227's responses to voir dire questions were relatively unremarkable, as he answered appropriately and asked the court to repeat one question, which he then proceeded to answer, apparently without difficulty.  Neither party sought more information about his prior arrest, and the trial judge did not delve into this issue on his own.

Obviously, we do not know the subjective reasoning in the prosecutor's mind as to why he challenged these two prospective jurors.  We can do no more than speculate, as no reason for the challenges--at least, none that appears to have mattered to the prosecutor in light of the characteristics of other prospective jurors he did not challenge--is obvious from this record.  While we are of course primarily concerned with the challenge to Juror No. 261, these particular challenges represent another facet of the relevant circumstances that the MAC should have taken into account.

We come now to the Commonwealth's argument that other facts and circumstances present in the record negate any possible inference of discrimination.  The Commonwealth's position, however, misconstrues and improperly conflates the three separate steps of the Batson inquiry.  Batson, as we previously described,

---

[23]  Whether the prior arrest served as a basis for the peremptory challenge is questionable given that Juror No. 134--who went unchallenged--disclosed a prior arrest for "drinking in public," and neither the trial judge nor the Commonwealth requested any further information about that arrest at voir dire.

establishes a framework in which a petitioner is first required to establish the prima facie inference, which we have said is a burden of production, not persuasion. Once that initial burden has been met, the striking party is required to articulate its race-neutral reasoning for its strike, and it is at the third stage where the petitioner bears the burden of persuasion. At the first stage of the inquiry, our concern is whether such an inference may be drawn in the first instance, not whether the inference, once drawn, may be rebutted.

Furthermore, even if it were proper to consider the Commonwealth's arguments in connection with the first prong, they are unavailing in any event. The Commonwealth reminds us that it also challenged Juror No. 229, "a young, white male," who was also a college student.[24] The Commonwealth's challenge of this juror does not undercut the inference of discrimination. The fact that the Commonwealth challenged one white college student does not change the fact that it seated another white college student (Juror No. 243) who was similarly situated to Juror No. 261. Thus, while the challenge of Juror No. 229 perhaps might have been relevant to

---

[24] While the record contains the transcript of Juror No. 229's voir dire, we have not been provided with a copy of his juror questionnaire. This makes it impossible for us to determine whether there are any obvious reasons for the challenge, such as an improperly completed form or inconsistent answers given at voir dire.

the third prong of the <u>Batson</u> analysis, it does not diminish the strength of the prima facie showing.

Next, relying on <u>United States</u> v. <u>Cresta</u>, 825 F.2d 538, 545 (1st Cir. 1987), the Commonwealth argues its use of peremptory challenges cannot have violated the precepts of <u>Batson</u> because they were based on age and age is not a cognizable class for purposes of equal protection challenges. Regardless of the ultimate merit of this position, it is inapposite here. The simple fact is the state court record discloses that the Commonwealth did not exercise its peremptory challenges based on age. Had it done so, it would have eliminated Juror No. 243, the white college student born in Russia.

Indeed, had age been the distinguishing characteristic motivating its challenges, the Commonwealth would presumably have eliminated all young women as well, since discrimination on the basis of gender is prohibited too. <u>J.E.B.</u> v. <u>Alabama ex rel. T.B.</u>, 511 U.S. 127, 130-31 (1994) ("Intentional discrimination on the basis of gender . . . violates the Equal Protection Clause . . . ."); <u>see</u> <u>also</u> <u>De Gross</u>, 913 F.2d at 1425 (holding purposeful elimination of men from the jury violated equal protection). The seated jurors included three women under the age of thirty, aged twenty-three, twenty-six and twenty-seven. As it is, the record demonstrates the Commonwealth may not have been exercising its peremptory challenges on the basis of age.

Moreover, the use of a constitutionally neutral characteristic--such as age--in a racially discriminatory manner constitutes race-based discrimination. The record shows here that with its strike of Juror No. 261, the Commonwealth had peremptorily challenged every young, black man in the jury pool. By contrast, it allowed other individuals who were young, male, and white or who were young and female to sit on Sanchez's jury. Only young, black men received this treatment from their government. Accordingly, it could be logical to conclude (or, put differently, to infer) that the Commonwealth's strikes may have been motivated not by age, but by race. This is all that was required of Sanchez at the first Batson prong.

In sum, based on the evidence in the state court record, we conclude the facts and circumstances were sufficient to permit an inference that the prosecutor's challenge of Juror No. 261 may have been racially motivated. We find, therefore, that Sanchez satisfied his initial burden under Batson, and the prosecutor should have been required to articulate a race-neutral reason for his peremptory strike. See Johnson, 545 U.S. at 173 (finding prima facie case established where totality of circumstances permitted inference that "discrimination may have occurred").

## 5. An Appropriate Remedy

Having found not only that the MAC unreasonably applied Batson, but also that Sanchez satisfied his burden of making out a prima facie case of discrimination, we must consider the appropriate remedy. Although we have held that a Batson violation constitutes a structural error from which prejudice to the defendant is "conclusively presumed," Scarpa v. Dubois, 38 F.3d 1, 14 (1st Cir. 1994), we are unable to determine from this record whether the Commonwealth's challenges were in fact racially motivated and, therefore, violative of Batson. All we know at this point is that the Commonwealth should have been required to present a racially neutral explanation for its challenge of Juror No. 261. It is, therefore, inappropriate to grant a new trial because Sanchez has not demonstrated he is entitled to habeas relief.

"The Batson framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." Johnson, 545 U.S. at 172. For this reason, the Supreme Court in both Batson and Johnson ultimately remanded to allow a factual, on-the-merits determination with respect to the second and third prongs. Batson, 476 U.S. at 100; Johnson, 545 U.S. at 173. Similarly, we believe that a remand to the district court is required here because the ultimate burden of persuasion rests with Sanchez. See Johnson, 545 U.S. at 170-71.

We recognize that in <u>Cullen</u> v. <u>Pinholster</u> the Supreme Court held that a federal habeas court may not hold an evidentiary hearing to permit the petitioner to develop evidence to satisfy his burden of showing either that the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. 131 S. Ct. 1388, 1400 (2011). <u>Pinholster</u>, however, applies only to situations in which the petitioner claims additional evidence beyond the state court record is necessary in order to show that he or she is entitled to habeas relief. <u>Pinholster</u>, we believe, does not prohibit an evidentiary hearing once a petitioner has successfully shown the state court unreasonably applied federal law.

Our conclusion that the MAC unreasonably applied <u>Batson</u> renders the strictures of <u>Pinholster</u> inapplicable here. Moreover, the Supreme Court itself ordered a remand to complete the <u>Batson</u> inquiry in both <u>Batson</u> and <u>Johnson</u>, and we decline to assume the Supreme Court in <u>Pinholster</u> overruled that aspect of two of its leading cases in this area sub silentio. <u>Cf.</u> <u>Smith</u> v. <u>Cain</u>, 708 F.3d 628, 635 (5th Cir. 2013) (holding that "<u>Pinholster</u>'s limitation on federal evidentiary hearings does not apply once the district court conclude[s], solely on the basis of the state court record, that the state trial court unreasonably applied federal law"). Accordingly, we believe it remains open to us to order a remand for an evidentiary hearing.

Because we are reviewing the district court's consideration of Sanchez's federal habeas claim, it is appropriate for the district court--as opposed to the Massachusetts trial court--to hold an evidentiary hearing to complete the Batson inquiry. This is the result obtained in the Ninth and Eleventh Circuits after a finding of error with respect to the first Batson prong, and it makes eminent sense to us as well. See Paulino v. Castro, 371 F.3d 1083, 1090 (9th Cir. 2004); Paulino v. Harrison, 542 F.3d 692, 694-95 (9th Cir. 2008) (affirming district court's grant of habeas petition following initial remand to complete the Batson inquiry); Madison v. Comm'r, Ala. Dep't of Corr., 677 F.3d 1333, 1339 (11th Cir.) cert. denied, 133 S. Ct. 617 (2012) (finding the petitioner had met his burden of making out a prima facie case "[b]y presenting several relevant circumstances that in sum were sufficient to raise an inference of discrimination" and remanding "for the district court to complete the final two steps of the Batson proceedings"). After all, the state courts have already had their say on the matter, and Sanchez's habeas petition has not yet been fully adjudicated. It is the district court's responsibility to resolve it.[25]

---

[25] For this reason, we part ways with our learned colleagues in the Seventh Circuit, who in the past have remanded to the state trial court to finish the Batson inquiry. Mahaffey v. Page, 162 F.3d 481, 486 (7th Cir. 1998).

Accordingly, we remand to the district court for it to hold an evidentiary hearing and complete the <u>Batson</u> inquiry. We acknowledge that jury selection took place more than seven-and-a-half years ago now, which is likely to present a rather challenging situation to the district court. Nonetheless, nothing in <u>Batson</u> or its progeny permits us to relieve Sanchez of his ultimate burden of persuasion. Further, a remand for the district court to at least attempt to put the pieces together again is in accordance with the well-reasoned decisions of our sister circuits and state courts that have grappled with how to resolve <u>Batson</u> claims years after trial.

In order to provide the district court and the parties with guidance as to what is expected of them on remand, we refer to the opinion of the California Supreme Court following the Supreme Court's remand in <u>Johnson</u>.[26] We find its roadmap directing further proceedings to be logical and well-reasoned:

> [The district] court should attempt to conduct the second and third <u>Batson</u> steps. It should require the prosecutor to explain his challenge[]. If the prosecutor offers a race-neutral explanation, the court must try to evaluate that explanation and decide whether defendant has proved purposeful racial discrimination. If the court finds that, due to the passage of time or any other reason, it cannot adequately address the issues at this stage or make a reliable determination, or if it determines that the prosecutor exercised

---

[26] <u>Johnson</u> came before the Supreme Court pursuant to a writ of certiorari.

-59-

his peremptory challenges improperly, it should set the case for a new trial. If it finds the prosecutor exercised his peremptory challenge[] in a permissible fashion, it should [affirm] the judgment.

People v. Johnson, 38 Cal. 4th 1096, 1103-04 (2004). The district court should do likewise here.


## CONCLUSION

By erroneously ignoring each individual juror's equal protection right not to be discriminated against, the MAC reached a result that has the effect of fostering increased racial discrimination and immunizing it from judicial review. This is diametrically opposed to Batson's raison d'être. Accordingly, the MAC's application of Batson's first prong goes beyond clear error and represents an objectively unreasonable application of clearly established federal law.

As the unreasonable application of federal law occurred at the first Batson step, we are unable to say on this record that Sanchez is entitled to habeas relief given that he bears the ultimate burden of persuasion on his Batson claim. Therefore, we must remand to the district court to conduct an evidentiary hearing and complete the Batson inquiry.

Accordingly, we hereby **vacate** the judgment of the district court and **remand** this matter for further proceedings consistent with this opinion.